JACK S. JAMES AND CAROL N. JAMES, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 27360-83, 33287-83, 24045-84, 29714-84, 30508-84, 40635-84, 40636-84.

Filed October 29, 1986.

---

[1]Cases of the following petitioners are consolidated herewith: Glen E. and Sybil H. Michael, docket No. 33287-83; David G. and Kathleen Ownby, docket No. 24045-84; Jack S. and Carol N. James, docket No. 29714-84; A.F. Boudreau, Jr., and Katherine F. Boudreau, docket No. 30508-84; Jeffrey H. and Mary E. Cope, docket No. 40635-84; and Robert S. and Phyllis H. Cope, docket No. 40636-84.

*Tom G. Parrott* and *Charles N. Woodward,* for the petitioners.

*Osmun R. Latrobe,* for the respondent.

WILLIAMS, *Judge:* In these consolidated cases, the Commissioner determined deficiencies in petitioners' Federal income taxes and additions to tax for the taxable years 1979, 1980, and 1981, in the following amounts:

| Docket No. | Petitioner | Year | Deficiency | Sec. 6653(a) additions to tax |
|---|---|---|---|---|
| 27360-83 | Jack S. and Carol N. James | 1979 | $349,785.90 | - - - |
| 29714-84 | Jack S. and Carol N. James | 1980 | 397,201.90 | - - - |
| | | 1981 | 269,325.97 | - - - |
| 33287-83 | Glen E. and Sybil H. Michael | 1979 | 211,680.00 | - - - |
| | | 1980 | 297,691.00 | - - - |
| | | 1981 | 230,108.50 | - - - |
| 24045-84 | David G. and Kathleen Ownby | 1980 | 12,214.00 | - - - |
| | | 1981 | 10,798.00 | - - - |
| 30508-84 | A. F. Boudreau, Jr., and Katherine F. Boudreau | 1980 | 639,054.27 | - - - |
| 40635-84 | Jeffrey H. and Mary E. Cope | 1980 | 132,314.00 | $6,615.70 |
| | | 1981 | 86,069.00 | 4,303.45 |
| 40636-84 | Robert S. and Phyllis H. Cope | 1980 | 175,125.00 | 8,756.25 |
| | | 1981 | 148,978.00 | 7,448.90 |

After concessions by the parties, the issues which this Court must decide are whether petitioners, as members of a joint venture, are entitled (1) to investment tax credits pursuant to section 46(e)(3)[2] on certain computer equipment purportedly acquired by the joint venture; and (2) to deductions for management fees pursuant to section 162.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners Jack S. and Carol N. James resided in Tulsa, Oklahoma, at the time their petition in docket No. 27360-83 was filed, and in Santa Barbara, California, at the time their petition in docket No. 29714-84 was filed. The remaining

---

[2]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, unless otherwise indicated.

petitioners each resided in Tulsa, Oklahoma, at the time their respective petitions were filed.

The principal actors in these cases are three related companies, each of which performs substantially the same functions: Communications Associates, Inc. (CAI), Communications Associates Leasing, Inc. (CALI), and Communications Leasing International, Inc. (CLI). Petitioner claims that these three companies (collectively, the Communications Group) analyzed and configured computer systems for large-scale users, purchased the computer equipment for these systems, then leased the equipment to the users.

In the transactions at issue in these cases, the Communications Group purchased and leased computer equipment and initially administered the leases covering the equipment. The Communications Group neither analyzed the needs of the users in the transactions at issue in these cases nor configured the computer equipment chosen by the lessees.

Jack James (James) was the president of CAI and CLI in 1979 and 1980. Glen E. Michael (Michael) was senior vice president of CALI in 1979 and president of CALI in 1980. The Communications Group employed an administrative staff of approximately 15 persons and used experienced independent contractors for professional assistance. In 1981 Mentco Corp. (Mentco) took over the administration and management of the portfolios of leases in which the Communications Group had continuing responsibilities.

The record does not reveal what common ownership, if any, there was between Mentco and the Communications Group. James' son is an officer of Mentco. Mentco and the Communications Group have the same address.

CLI purchased from the Amdahl Corp. (Amdahl) an Amdahl 470V/7 computer system, serial number 10055 (Amdahl 10055), on June 19, 1979, for $3,211,000, which CLI financed by executing an installment note in favor of Amdahl. The first 18 monthly payments due under the note were $56,000 each; the remaining 44 payments were $69,000 each. A final payment of $258,917 was due on March 1, 1985. CAI and Amdahl executed a security agreement covering the equipment to secure CLI's obligation to Amdahl.

CAI leased the Amdahl 10055 to Massey-Ferguson, Inc. (Massey-Ferguson), for a term of 62 months, commencing January 1, 1980. The rental rate was $56,000 per month for the first 18 months of the lease and $69,000 per month for the remainder of the lease term. Massey-Ferguson remitted the rent directly to Amdahl which satisfied CLI's monthly payments due Amdahl under CLI's installment note.

By letter dated October 24, 1983, Massey-Ferguson canceled the lease as of December 31, 1984. The parties stipulated that on November 1, 1983, Massey-Ferguson subleased the Amdahl 10055 to Major Computer, Inc. The record has only a draft sublease dated November 1, 1983, between Massey-Ferguson and Major Computer, Inc., for the sublease of the Amdahl 10055, for a term of 15 months, at a monthly rate of $7,000.

Another lease of the Amdahl 10055 was executed between Mentco Corp. (on behalf of CAI) as lessor and Major Computer as lessee on November 1, 1983, for a term of 9 months, at a monthly rate of $7,000. Attached to the lease in the record is an undated, unexecuted certificate of acceptance. The commencement date of the lease is not in the record. An addendum to the lease provided that the lessee could purchase the equipment at the conclusion of the lease by paying its then fair market value.

Each lease of the Amdahl 10055 was a net-net-net lease, under which the lessee was responsible for all costs relating to the installation, maintenance, taxes, and insurance of the computer equipment. The lease provided that "LESSOR IS NOT A MANUFACTURER OR VENDOR OF THE EQUIPMENT." The Communications Group played no role in the selection or configuration of computer equipment by the lessees. The lease was negotiated at arm's length and reflected competitive terms and rates. We find, based on the parties' agreement, that the residual value of the computer equipment at the end of the lease term would not exceed 35 percent of the manufacturer's original sales price.

CAI purchased from Amdahl a second 470V/7 computer system, serial number 70078 (Amdahl 70078), at a cost of $2,550,000 on December 28, 1979, financed by a loan from the State Street Bank. CAI leased the equipment to Amdahl for a term of 3 months, commencing January 1, 1980, then

sold it to Northern Illinois University (NIU) pursuant to a "lease" that was, in fact, a conditional sales contract.

CAI transferred its interest in the Amdahl lease and the NIU conditional sales contract to CALI, for no consideration, on December 28, 1979. The NIU conditional sales contract was subsequently assigned to the State Street Bank. NIU remitted annual payments due under the NIU contract, in the amount of $394,976.76 per year, directly to the State Street Bank. On or about July 1, 1984, NIU exercised its option to pay off any remaining indebtedness encumbering the computer system and to acquire title to the Amdahl 70078, for an additional $1.

Petitioners in these cases are members of two joint ventures. Although petitioners treated the two joint ventures as one and named it "Petroleum Trading and Transport Joint Venture Number One," in fact the joint ventures had different members and involved different transactions that were separately documented. For convenience, therefore, we will identify them—as described more fully below—as JV#1 and JV#2.

JV#1 was formed on December 28, 1979, by Petroleum Trading & Transport Co. (PTT), an Oklahoma corporation controlled by A.F. Boudreau, Jr. (Boudreau); Michael Leasing Co. (MLC), a partnership owned equally by Glen E. and Sybil H. Michael; and Jack S. James (James).

JV#1 executed a purchase agreement with CALI on December 28, 1979, under which CALI purported to sell to JV#1 the Amdahl 10055 subject to the lease to Massey-Ferguson (the 1979 transaction).[3] The purchase price of JV#1's purported interest in the Amdahl 10055 was $2 million. JV#1 financed the purported purchase by executing a promissory note payable on demand in the principal amount of $300,000 and a recourse installment note in the principal amount of $1,700,000. JV#1 was also obligated to pay CALI an implementation fee of $150,000. The record does not indicate how this amount was financed by JV#1. The equipment was

[3]There is some confusion with respect to whether the purchase agreement covered the Amdahl 70078 or the Amdahl 10055. Petitioners argue that the equipment purchased was the Amdahl 10055, leased to Massey-Ferguson, and that the documents which refer to the Amdahl 70078, "leased" to NIU, are in error. Although the record is not entirely clear, we find that the Amdahl 10055 was the subject of the 1979 transaction.

subject to Amdahl's priority security interest securing CLI's $3,211,000 note.

The purchase agreement stated that CALI sold to JV#1 "all of Seller's right, title and interest in and to the Equipment, subject to a security interest therein to the Lending Institution and subject to the assignment of Seller's right to receive rental payments from the Lessee of the Equipment." However, JV#1 acquired only a 52.6-percent interest in the equipment, as interests in the equipment were sold by CAI and CALI to other investors as well. CALI and CAI received proceeds from investors totaling $3,801,250 in connection with the purported sale of the Amdahl 10055. The agreement also provided that CALI would have a "nonexclusive right to remarket" the equipment. On remarketing the equipment CALI would be entitled to receive 25 percent of the net proceeds of such remarketing.

JV#1 and CALI executed two other agreements on December 28, 1979—an agency agreement and an administrative services agreement. The agency agreement stated that CALI was authorized to acquire computer equipment suitable for lease to a user of such equipment and to lease the equipment to such users as the nominee of JV#1. The agency agreement provided that JV#1 was not personally liable in any manner on CALI's obligation to Amdahl incurred to finance CAI/CALI's acquisition of the equipment. The administrative services agreement stated that CALI would perform various administrative functions involved in the leasing of the computer equipment purchased by JV#1. Management fees for these services were due annually in the following amounts:

*Dec. 28—*

| | |
|---|---|
| 1981 | $72,000 |
| 1981 | 57,600 |
| 1982 | 48,000 |
| 1983 | 39,600 |
| 1984 | 39,600 |
| 1985 | 39,600 |
| 1986 | 39,600 |

A restated administrative services agreement between JV#1 and CALI, dated June 30, 1982, canceled the earlier

agreement as of December 28, 1982. The restated agreement pooled rent from equipment covered by CAI's and CALI's administrative service arrangements with JV#1 and other similar investors with rent from leases of equipment owned by CAI or CALI. The record does not identify the equipment or leases owned by CAI or CALI, the rent from which was pooled pursuant to the restated agreement. The restated agreement provided that rental income would be allocated to the participating investors pursuant to a formula. JV#1's share of pooled income was determined by multiplying the gross pool income by a fraction representing the ratio between JV#1's investment and total investment in the pooled equipment. This figure was then multiplied by a "TR Factor," supposedly to adjust for such differences as useful life and maturity in the pooled equipment. The result was JV#1's pro rata share of pooled income (adjusted pool rental income). James, president of CALI and a member of JV#1, was unable to describe at trial how the TR Factor was determined.

Pursuant to the restated agreement, the management fee schedule of the original administrative services agreement was canceled, and management fees were set at a rate of 16 percent of adjusted pool rental income. The restated agreement also provided that the "Normal Rental Rate" of the equipment was 21.619 percent of the investment of JV#1. If gross pool income exceeded the Normal Rental Rate, CALI was entitled to retain the excess as a "performance fee," in addition to its management fees.

During the years 1980 through 1984, annual statements to JV#1 reported that JV#1's rental income on the Amdahl 10055 and obligations with respect thereto were as follows:

| Year | Rental income | Obligations |
|------|--------------|-------------|
| 1980 | $452,008.51 | $452,008.51 |
| 1981 | 437,608.51 | 437,608.51 |
| 1982 | 428,008.51 | 428,008.51 |
| 1983 | 452,380.00 | 452,380.07 |
| 1984 | 452,243.48 | 452,243.55 |

The obligations represented payments of principal and interest due on JV#1's installment note in the principal amount of $1,700,000, payments due for management fees, and payments due on a promissory note executed December

27, 1979. It is not clear from the record what the December 27, 1979, promissory note was for; the principal amount and term are unknown, but annual payments of $30,811.51 were due under it. Lease revenue and management fee calculations for the years 1983 and 1984 were calculated pursuant to the income pooling arrangement described in the restated administrative services agreement of June 30, 1982.

JV#1 was initially capitalized with demand promissory notes aggregating $300,000 bearing interest at a rate of 10 percent per year which were paid on February 29, 1980. PTT contributed $200,000; MLC contributed $50,000, and James contributed $50,000.

The joint venture agreement states that interests of the members in gross income earned by JV#1 through December 28, 1986, are as follows:

| | |
|---|---|
| PTT | 47.6% |
| MLC | 26.2 |
| James | 26.2 |

The interests of the members in JV#1 gross income earned after December 28, 1986, including gross proceeds from the sale of the Amdahl 10055, are stated to be as follows:

| | |
|---|---|
| PTT | 50% |
| MLC | 25 |
| James | 25 |

As stated in the joint venture agreement, the interests of the members in the obligations and liabilities of JV#1 are as follows:

(1) On a promissory note in the principal amount of $300,000, with interest at 10% per year, issued to CALI by JV#1 and paid on February 29, 1980:

| | |
|---|---|
| PTT | $\frac{2}{3}$ |
| MLC | $\frac{1}{6}$ |
| James | $\frac{1}{6}$ |

(2) On an installment note in the principal amount of $1,700,000.00 issued to CALI by JV#1:

| | |
|---|---|
| PTT | 47.06% |
| MLC | 26.47 |
| James | 26.47 |

(3) On all other obligations and liabilities of JV#1 the interests were stated as follows:

```
PTT ........................................ 50%
MLC........................................ 25
James....................................... 25
```

A second joint venture (JV#2) was formed on January 15, 1980, by amendment to the joint venture agreement governing JV#1. The seven members of JV#2 are PTT, MLC, James, Boudreau, David G. Ownby, Robert S. Cope, who worked for Boudreau, and Jeffrey H. Cope, son of Robert S. Cope. Some of the members of JV#2, viz, Boudreau (as an individual), Robert S. Cope, Jeffrey H. Cope, and David G. Ownby, had no interest in the computer equipment in which JV#1 had its interest. JV#1's 1979 transaction was independent of JV#2's transaction, which were the subject of a separate, unrelated agreement. Separate annual statements of account were provided for JV#1's transaction and for JV#2's transaction.

In 1980, JV#2 purported to buy from CALI three computer systems subject to leases: (1) An Amdahl system leased to Duke Power Co. (Duke Power); (2) an IBM system leased initially to Union Metal Manufacturing Co. (Union Metal); and (3) an IBM system leased to Empire Detroit Steel (Empire Detroit). CAI or CALI purchased the computer equipment from the manufacturers in separate transactions.

CAI purchased an Amdahl system on October 31, 1980, CAI paid the full purchase price of $2,750,000 by check. CAI executed a short-term promissory note on November 5, 1980, payable to the Fourth National Bank of Tulsa in the amount of $1,761,214, secured by the Amdahl equipment. The note was refinanced by a long-term, nonrecourse note to the Philadelphia National Bank in the amount of $3,550,465.20, executed on January 19, 1981, and secured by the Amdahl equipment. The first payment under this note was due on February 1, 1981, in the amount of $105,100. Monthly payments for the ensuing 44 months were each due in the amount of $78,983 and for the remaining 36 months each in the amount of $42,686.

CAI leased the equipment to Duke Power for a term of 84 months pursuant to a lease dated October 1, 1980. The equipment was installed and accepted by Duke Power on November 1, 1980, and CAI permitted Duke Power 30 days without rent for complex system testing. The rental rates

were $39,800 per month for the first 48 months of the lease and $20,666 for the remaining 36 months of the lease term. Pursuant to an operating agreement dated October 1, 1980, Duke Power could elect to terminate the lease after 48 months. Duke Power gave CAI notice of such election on October 1, 1980. On October 2, 1980, Duke Power rescinded this election in accordance with the terms of the operating agreement. On October 31, 1980, CAI assigned to CALI its interest in the equipment under the Duke Power lease, subject to the security interest held by the Philadelphia National Bank. The equipment remained under lease to Duke Power as of December 1985.

CAI purchased an IBM system, originally ordered by Union Metal, in two transactions on November 12 and November 18, 1980, for a price of $208,174. IBM had assigned to CAI the right to purchase the equipment on October 6, 1980. CAI gave two nonrecourse installment notes in the amounts of $81,071.33 and $78,921.48, and dated December 1980 and January 1981, respectively, to finance the purchase of the equipment. The record does not show how the balance of the purchase price was paid. The notes were payable to the Midlantic National Bank (Midlantic), and were secured by the IBM equipment. On October 31, 1980, CAI assigned its interest in the IBM equipment to CALI, subject to Midlantic's security interest.

CAI leased the IBM equipment to Union Metal under two separate lease schedules executed September 4, 1980, and November 4, 1980. Each schedule set forth terms of 58 months. The master lease between CAI and Union Metal incorporating these lease schedules was executed September 3, 1980. Rental under the master lease was $4,340 per month. CAI assigned all rental payments due under the lease to Midlantic, informing Union Metal of the assignment by letter dated November 6, 1980. Union Metal accepted the assignment on November 13, 1980. The equipment was installed and accepted under the separate lease schedules on December 2, 1980, and December 16, 1980, respectively.

Subsequent to entering the lease, Union Metal declared bankruptcy. In June of 1985, the computer equipment subject to the Union Metal lease was repossessed by

Midlantic. CALI repurchased the equipment from Midlantic at a price less than the amount remaining due on CAI's nonrecourse notes with the bank dated December 1980 and January 1981, respectively.

CALI purchased another IBM system for $347,110 on December 15, 1980. CAI had ordered the equipment from IBM and transferred its interest in the equipment to CALI for no consideration on October 31, 1980. CALI paid IBM by check on February 16, 1981. CAI financed the purchase through a promissory note in the amount of $347,110 to the Fourth National Bank of Tulsa. CALI refinanced the purchase by executing a nonrecourse installment note payable to the Philadelphia National Bank in the principal amount of $347,109.85 on March 16, 1981, secured by the IBM equipment. The first payment under this note was due April 1, 1981, in the amount of $6,220.72. The remaining 58 monthly payments were each due in the amount of $8,534.79.

CALI leased the equipment to Empire Detroit and assigned its right, title, and interest in the Empire Detroit lease to the Philadelphia National Bank. The original term of the lease was 60 months, commencing February 1, 1981, at a rate of $9,413 per month. Monthly rental payments were remitted directly to the Philadelphia National Bank by Empire Detroit, commencing March 1, 1981.

On July 10, 1981, CALI informed Empire Detroit by letter that the original lease term of 60 months was in error. CALI submitted an amended lease schedule with a term of 58 months, but also stated that "should you determine that you will need this equipment for the 59th and 60th month and even longer, we will allow an extension at no increase in rate." The monthly rental rate of $9,413 was not changed. The lease was in effect as of December 1985.

The leases in each of the three 1980 transactions were net-net-net leases and provided that "LESSOR IS NOT A MANUFACTURER OR VENDOR OF THE EQUIPMENT." All transactions were negotiated at arm's length, and all contracts reflected competitive terms and rates. The parties have stipulated that the residual value of the equipment, at the end of each lease term, did not exceed 35 percent of the manufacturer's original sales price.

CALI purported to sell to JV#2 the three computer systems, subject to the leases, pursuant to a purchase agreement executed on October 31, 1980 (the 1980 Agreement). The purchase price of the equipment was $3,800,000, financed by a demand note for a downpayment of $817,000, which was satisfied on December 31, 1980, and an installment note executed by JV#2 in the principal amount of $2,983,000 payable to CALI. JV#2 also incurred an implementation fee of $57,000, financed by a recourse demand note executed by JV#2 and payable to CALI. The note was paid December 31, 1980. As with JV#1's 1979 transaction, under the 1980 Agreement, JV#2 gave CALI a "nonexclusive right to remarket" the equipment, for which it would receive a 25-percent commission.

JV#2 and CALI executed an administrative services agreement on October 31, 1980, under which CALI agreed to administer the leases purportedly transferred to JV#2 by the 1980 Agreement. The rental income allocated to JV#2 was calculated under terms identical to the pooling arrangement provided by the 1982 restated administrative services agreement between JV#1 and CALI. The management fee due CALI was likewise set at the rate of 16 percent of the adjusted pool rental income received.

JV#2's allocation of pooled rental income and obligations pursuant to the 1980 Agreement were stated by Mentco as follows:

| Year | Rental income (pooled) | Obligations |
|------|------------------------|-------------|
| 1980 | $125,812.81 | [1]$125,844.01 |
| 1981 | 744,114.41 | 744,106.42 |
| 1982 | 763,845.41 | 763,837.43 |
| 1983 | 763,083.39 | 763,075.40 |
| 1984 | 762,574.49 | 762,566.52 |

[1] This figure excludes the $817,000 downpayment for the equipment, financed in the form of a promissory note to CALI from JV#2 due and payable in one installment on Dec. 29, 1980, and the $57,000 implementation fee, financed in the form of a promissory note to CALI from the JV#2 also due and payable in one installment on Dec. 29, 1980.

Obligations of JV#2 included payment of CALI's management fee and payments of the principal and interest on JV#2's $2,983,000 promissory note to CALI.

In connection with their downpayment under the 1980 Agreement, the members of JV#2 contributed the following amounts to the joint venture:

| | |
|---|---:|
| PTT | $11,362 |
| MLC | 69,046 |
| James | 69,046 |
| Boudreau | 229,862 |
| Robert S. Cope | 298,908 |
| Jeffrey H. Cope | 173,052 |
| David G. Ownby | 22,724 |

Interests of the members in the profits and liabilities of JV#2 arising out of the 1980 Agreement were as follows:

| | |
|---|---:|
| PTT | 1.3% |
| MLC | 7.9 |
| James | 7.9 |
| Boudreau | 26.3 |
| Robert S. Cope | 34.2 |
| Jeffrey H. Cope | 19.8 |
| David G. Ownby | 2.6 |

JV#1 and JV#2 filed partnership information returns for each of the taxable years at issue in these cases as a single joint venture, Petroleum Trading and Transport Joint Venture No. One (PTTJV).

## OPINION

Petitioners argue that the members of JV#1 and of JV#2 each entered the ventures with the purpose of realizing a profit from their investment in computer equipment and that the joint ventures were engaged in a trade or business or in an activity for profit. Petitioners argue that their interests in the computer equipment were purchased from the Communications Group and would have a significant residual value at the conclusion of the lease to which the equipment was subject. Therefore, they contend that they are entitled to the investment tax credit and business expense deductions claimed on their returns.

Respondent contends that the transactions at issue in these cases lacked economic substance and business purpose, that petitioners in these cases lacked a profit motive, and that the sole purpose of entering into the transactions

at issue was tax avoidance. On this basis, respondent urges that the transactions should be disregarded as shams for Federal income tax purposes.

A transaction is without its intended effect for Federal income tax purposes if (1) it is a sham, being a mere paper chase or is otherwise fictitious (*Falsetti v. Commissioner*, 85 T.C. 332 (1985)), or (2) the transaction is devoid of economic substance consonant with its intended tax effects (*Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978); *Knetsch v. United States*, 364 U.S. 361, 366 (1960)). The substance of the transaction, not its form, determines its tax consequences. The transaction must have economic substance which is "compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance— features that have meaningless labels attached." *Frank Lyon Co. v. United States*, 435 U.S. at 583-584; *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985); *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982).

It must be recognized that the tax laws affect the shape of every business transaction. The parties to a transaction are entitled to take into account and to maximize favorable tax results so long as the transaction is compelled or encouraged by non-tax business reasons. *Frank Lyon Co. v. United States*, 435 U.S. at 580.

The form of the transactions at issue in these cases is that JV#1 and JV#2 purchased computer equipment subject to leases from CALI (type A below). Respondent argues that, in substance, JV#1 and JV#2 acquired no economic interest in the equipment or the leases but merely purchased tax benefits from CALI. Respondent concedes that the transactions involving CAI/CLI, the manufacturer, the lender, and the lessee, are typical purchase and lease transactions having economic substance and business purpose (type B below). A diagram of the transactions in these cases is as follows:

Respondent argues that transaction type (A), involving JV#1/JV#2 and CAI/CALI, has no business or economic relationship to transaction type (B) and is without economic substance or business purpose; in short, that neither JV#1 nor JV#2 owned the equipment bought and leased in transaction (B). Petitioners respond that CAI/CALI acted as agents for the joint ventures, and that the joint ventures were an integral element of the substantive transaction type (B). We agree with respondent's view.

The Communications Group purchased the computer equipment, obtained long-term, nonrecourse financing for the purchases, gave the lending institutions priority security interests in the equipment purchased, leased the equipment to various lessees, and assigned to CALI their respective interests in the equipment and the leases covering the equipment. These purchases were negotiated at arm's length and reflected competitive market prices. Simi-

larly, the leases covering the equipment reflected competitive terms and rental rates.

Net-net-net leases are commonly negotiated in equipment leasing transactions. The 1979 and 1980 transactions among the Communication Group as purchasers-lessors, the manufacturers-sellers, the third-party lenders, and the lessee-users (transaction type (B) above) were all valid transactions possessing economic substance and business purpose. See *Estate of Thomas v. Commissioner*, 84 T.C. at 436-437. We reach an opposite conclusion regarding the transactions between CALI and the joint ventures (transaction type (A) above).

CALI purported to sell the computer equipment, or an interest in it, to the joint ventures in exchange for cash and recourse notes payable to CALI. JV#1 and JV#2, however, acquired no equity interest in the computer equipment or the leases. Instead, the joint ventures purchased only hoped-for tax benefits from CALI.

CALI purchased the proportionate share of the equipment that it purported to sell to JV#1 in the 1979 transaction for $1,689,444.21. JV#1 paid $2 million for its interest. CALI purchased the equipment that it purported to sell to JV#2 in the 1980 transaction for $3,305,284. JV#2 paid $3,800,000 for its interest. The joint ventures, therefore, paid CALI an approximate 15-percent markup over manufacturer's price. Petitioners argue that the markup in price compensated CALI for its services in configuring, acquiring, and leasing the equipment, and reflected the enhanced value of the equipment as a result of CALI's services. The record, however, is barren of evidence to support petitioners' contention that the value of the equipment was enhanced subsequent to its acquisition by CALI. Whatever might have been CALI's general business practices in other transactions, in the transactions at issue CALI did nothing to add value to the equipment. Employees of the lessees testified that CALI did not participate in their leasing transactions except to arrange financing.

CALI's price markup is inconsistent with the actions of one acting as an agent considering that the joint ventures also paid CALI substantial fees in each transaction, including "implementation fees," "management fees" and "perfor-

mance fees." CALI was more than fully compensated for its services to the joint ventures by the implementation and management fees it received from JV#1 and JV#2. The net result of the markup and payment of the fees, as discussed below, was that the Communications Group stripped out any cash-flow from the leases, and the joint ventures had no chance of making a profit even under the most optimistic estimate of residual value.

The computer equipment remained subject to the priority security interests of third-party lending institutions as security for the CAI/CLI loans. Following the default of Union Metal, the equipment purportedly owned by JV#2 was repossessed by Midlantic, the third-party lender. CALI repurchased the equipment from the lender at a price less than the amount remaining on its nonrecourse obligation with the lender. Although CALI incurred savings in the form of canceled debt, these savings were not passed on to JV#2. This action also belies CALI's purported agency status. We conclude that CALI was a principal acting for its own account. Consequently, the joint ventures' transactions with the Communications Group must stand on their own footing and do not inherit through CALI any of the business substance that exists in the transactions between the Communications Group and the manufacturers, lenders, and lessee-users.

Further, we note that the documentation of the 1979 transaction indicates that JV#1 purchased the Amdahl 70078, leased first to Amdahl, and subsequently sold to Northern Illinois University. This documentation includes not only the documents at the time of the purported sale in 1979, but also the restated administrative services agreement in 1982 and the annual statements from Mentco. Petitioners claim that this documentation was in error, which error was discovered in 1984 and corrected as petitioners prepared for trial. This indicates to us that some of the petitioners (who were members of both JV#1 and JV#2) did not exercise normal care in ascertaining which equipment they "owned," where it was located, or which lessee had leased the equipment. This imprudent conduct suggests that the business substance of these leasing transactions was not of primary concern to petitioners.

Moreover, the arrangement between JV#1 and CALI is imbued with inexplicable anomalies. The rental income allocated to JV#1 was from the 1979 lease of the Amdahl 10055 to Massey-Ferguson which called for a monthly rental of $56,000 for the first 18 months of the lease and $69,000 for the remainder of the lease term. For 1980 JV#1's rental income should have been its representative share of the rent generated by the lease: namely, $353,472 (52.6 percent of $672,000). This figure is approximately $98,000 less than that which was actually allocated to JV#1. In 1981 and 1982, the rental rates under the Massey-Ferguson lease rose, while actual rental income allocated to JV#1 decreased. We find no evidence in the record to account for these discrepancies. Income "pooling" did not commence until 1983.

All the transactions at issue generated zero cash-flow to the joint ventures during each year at issue in these cases. During the years 1980 through 1984, JV#1 received statements reporting the following net returns with respect to the 1979 transaction:

|  | 1980 | 1981 | 1982 | 1983 | 1984 |
|---|---|---|---|---|---|
| Rental income: | $452,008.51 | $437,608.51 | $428,008.51 | $452,380.00 | $452,243.48 |
| Obligations: | (452,008.51) | (437,608.51) | (428,008.51) | (452,380.07) | (452,243.55) |
| Net return: | 0.00 | 0.00 | 0.00 | (0.07) | (0.07) |

JV#1 received no statement for the year 1979, and CALI allocated no "rental income" for the year 1979 to JV#1. Considering the $150,000 implementation fee that JV#1 paid CALI, JV#1's out-of-pocket cash requirements, not counting the downpayment, were $150,000.14.

The cash-flow to JV#2 also was zero during each of the years 1980 through 1984. Discrepancies between rental income allocated to JV#2 and that due under the leases covering the equipment pursuant to the 1980 Agreement are similar to the discrepancies in the record regarding JV#1's 1979 transaction. Income "pooling" was, however, in effect for JV#2's transaction from its inception.

Perhaps most importantly, the administrative services agreements served to assure that cash-flow during the terms of the various leases would be enjoyed only by CALI.

Each agreement provided that if rental income allocated to the joint ventures pursuant to the pooling arrangements exceeded the "Normal Rental Rate" the excess would be retained by CALI as a "performance fee." The record again has no evidence of any performance that would justify the fee. We believe that the fee enabled CALI to enhance its own equity interest in the equipment and leases.

Since cash-flow during the lease terms was zero, the residual value of the computer equipment is the sole source of potential profit. Petitioners anticipated that the residual value of the equipment would not exceed 35 percent of the manufacturer's original sales price. The parties stipulated a broad range of actual values of between zero and 35 percent of the manufacturer's original price reflecting the significant degree of speculation and uncertainty in the computer leasing market. However, looking to the most optimistic residual values anticipated, we find that petitioners could not generate any net return on their investment in the joint ventures.

For these joint ventures to generate a profit, the residual values to be realized on remarketing the equipment must exceed the sum of the downpayment on the equipment, the implementation fees paid to CALI, and the 25-percent commission[4] due to CALI for remarketing the equipment. The residual value of the equipment is a percentage of the "manufacturer's original sale price"—the price between the manufacturer and CAI. Consequently, the return to JV#1 on the remarketing of the equipment purchased in the 1979 transaction would be as follows:

| | |
|---|---:|
| Manufacturer's original price[1] | $1,689,444.21 |
| Residual value | ×.35 |
| Gross proceeds | 591,305.47 |
| Downpayment | (300,000.00) |
| 25% Commission to CALI | (147,826.36) |
| Cash-flow | (.14) |

---

[4]Petitioners allege that the equipment could be remarketed by someone for less than the 25-percent commission to CALI. The joint ventures played no role in the purchasing, leasing, or servicing of the equipment. CALI knew the location, status, and condition of the equipment, and we believe that petitioners did not. We believe it is a fair inference that the only one likely to have any role in the remarketing of the equipment would be CALI. Anticipating the 25-percent commission as cost associated with petitioners' investment is, therefore, appropriate.

Implementation fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ($150,000.00)
   Net profit (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (6,521.03)

[1]Since JV#1 "purchased" only a portion of the Amdahl 10055, the manufacturer's original price is calculated in the following manner:

$$\frac{{}^{1}\$2,000,000}{{}^{2}\ 3,801,250} \times {}^{3}\$3,211,000 = \underline{\$1,689,444.21}$$

(Proportionate share of manufacturer's price to JV#1)

[1]Sales price to JV#1 (including the lease).
[2]Total investment in the Amdahl 10055.
[3]Manufacturer's original sales price, paid by CAI to the manufacturer.

The return on the remarketing of the equipment purchased in the 1980 transactions would be as follows:

| | |
|---|---:|
| Manufacturer's original price[1] . . . . . . . . . . . . . . . . . . . . . . | $3,305,284.00 |
| Residual value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ×.35 |
|    Gross proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,156,849.40 |
| Downpayment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (817,000.00) |
| 25% Commission to CALI . . . . . . . . . . . . . . . . . . . . . . . . . . . | (289,212.35) |
| Cash-flow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (.27) |
| Implementation fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (57,000.00) |
|    Net profit (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (6,363.22) |

[1]This price represents the sum of those paid for the three systems separately purchased by CAI and leased to Empire Detroit, Duke Power, and Union Metal. The parties aggregate these transactions as do we. A different result is not suggested by examining these transactions separately.

Even assuming realization of the maximum residual values anticipated, the joint ventures would realize a net loss. We conclude that (1) there was no objective possibility that the transactions at issue in these cases would be profitable and (2) that petitioners' transactions were without economic substance.

The transactions between the joint ventures and CALI were independent of and unaffected by the transactions that occurred between the Communications Group, the manufacturers, the lenders, and the lessees. The transactions between the joint ventures and CALI were structured so that no prospect of achieving a non-tax profit from the transactions existed at the time the joint ventures entered into them.[5] The joint ventures acquired no interest in the

[5]The circumstances of this case do not warrant application of the subjective business purpose test of Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184 (1983) affd. in part, revd. in part 752 F.2d 89 (4th Cir. 1985). Petitioners were sophisticated investors who should have known that the transactions at issue could not achieve a non-tax profit.

computer equipment or the leases covering that equipment. Instead, the joint ventures merely purchased a package of tax benefits from CALI.

Petitioners have failed to establish that the joint ventures owned the equipment on which they claimed investment tax credits. Because petitioners did not acquire any interest in the computer equipment the investment tax credits at issue in these cases were properly disallowed.

Disallowance of the claimed management fee deductions also follows. The management fees established under the administrative services agreements bore no apparent relation to the actual services performed by CALI. Through the annual management fees, including the "performance fee," petitioners attempted to meet the 15-percent test of section 46(e)(3)(B) to qualify each transaction for the investment tax credit but achieved only to strip cash-flow from the leases for CALI's benefit. The joint ventures were not engaged in these transactions for profit.

To reflect concessions by the parties,

> *Decisions will be entered pursuant to Rule 155.*

Reviewed by the Court.

STERRETT, SIMPSON, GOFFE, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, WRIGHT, and PARR, *JJ.*, agree with this opinion.

GERBER and WELLS, *JJ.*, did not participate in the consideration of this opinion.