WILLIAM NORMAN AND PHYLLIS JANE MILNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Milner v. Commissioner
Docket No. 13124-88
United States Tax Court
T.C. Memo 1993-91; 1993 Tax Ct. Memo LEXIS 91; 65 T.C.M. (CCH) 2085; March 16, 1993, Filed *91 William N. Milner and Phyllis J. Milner, pro se. For respondent: Michael J. Cooper and William P. Boulet, Jr.
SCOTT SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1981 and 1982 in the amounts of $ 23,350.59 and $ 21,927.20, respectively, and additions to tax under section 6653(a)(1) [1] in the respective amounts of $ 1,167.53 and $ 1,096.36. Respondent also determined an addition to tax under section 6653(a)(2) for each of these years in the amount of 50 percent of the interest on the deficiency attributable to negligence and additional interest for each year under section 6621(c) on the amount of the deficiency attributable to a tax-motivated transaction. Respondent also determined an addition to tax under section 6659 for 1981 in the amount of $ 7,005.18 and an addition to tax under section 6661 for the year 1982 in the amount of $ 2,192.72. *92 The issues for decision in this case are: (1) Whether petitioners are entitled to a deduction in 1982 for development expense of a gold and silver mine and, if so, the amount of deduction to which they are entitled; and (2) whether petitioners are liable for additions to tax under sections 6653(a)(1) and (2) and 6661, and for additional interest under section 6621(c) as determined by respondent. An issue for the year 1981 was severed from the issues involved in this case for the year 1982 and the severed issue was tried in April 1990 and an opinion with respect to that issue was filed September 24, 1991, Milner v. Commissioner, T.C. Memo. 1991-464. The issue involved in the 1981 case concerns petitioners' claimed deduction for development expense for 1981 with respect to ore material purportedly purchased from American Precious Metals to be extracted from the North Reveille Project or Gila Mines. FINDINGS OF FACT All of the facts have been stipulated. However, a substantial portion of the stipulation is the testimony from prior cases heard by the same Judge who heard the instant case. This testimony was stipulated as being included in this case *93 as if the witnesses had testified in this case. The stipulation also included reports of expert witnesses which had been introduced into evidence in the prior cases which the parties stipulated should be received in the instant case as the direct testimony of the experts. Because of the nature of the stipulation, it is not feasible to find the facts as stipulated. However, attached to the stipulation as Exhibit A is the stipulation of facts prepared for another case, and as Exhibit B, a first supplemental stipulation of facts received in the same case as the testimony of the witnesses stipulated by the parties. The facts stipulated in these two stipulations, Exhibits A and B, are found as stipulated. Petitioners, who were husband and wife in 1982, filed a joint Federal income tax return for that year on the cash method of accounting. At the time their petition in this case was filed, petitioners lived in Plano, Texas. William Milner (petitioner) is employed as a computer program analyst for S.E.I. Corp. In 1982 he was 40 years old. Petitioner received his B.A. degree from Harding College in Searcy, Arkansas, with a major in mathematics and a minor in English, in 1966. He *94 also attended Little Rock University and the University of Arkansas. In December 1982 Mr. William Jaco, a financial planner who had some years prior assisted petitioner in connection with his investments, contacted petitioner with respect to investing in Consolidated Mining and Manufacturing Corp. (CMMC). Mr. Jaco had an office in Sherman, Texas. In 1981 Mr. Jaco had sold petitioner certain "ore material" on behalf of American Precious Metals which was stated to be contained in the North Reveille Project or Gila Mines. In December 1982 Mr. Jaco gave petitioner a prospectus prepared by CMMC and told petitioner that the investment was in gold and silver mining. About a week after he gave petitioner the prospectus, Mr. Jaco furnished petitioner with contract forms and related documents to be signed to make a purported investment in CMMC. Petitioner did not know any of the individuals connected with CMMC and he did not talk to anyone other than Mr. Jaco about an investment in CMMC. However, on or about December 29, 1982, petitioner signed the document supplied to him by Mr. Jaco, which was entitled Purchase Agreement. This document recited that petitioner was purchasing the rights *95 to 400 tons of ore material from CMMC for $ 500 ($ 250 per 200-ton unit), plus a royalty of 35 percent by weight and kind of mineral recovered. The Purchase Agreement recited that it was the purchaser's sole responsibility to develop and mine his "ore-bearing material" and the purchaser was solely responsible for developing his own recovery method to be used for processing the ore. The Purchase Agreement recited that the seller (CMMC) had mineral rights in specific claims in Lake County, Colorado. However, no specific property was described in the Purchase Agreement as belonging to or being leased to petitioner nor was any location given in the Purchase Agreement for petitioner's 400 tons of material. Also under date of December 29, 1982, petitioner signed a document entitled "Addendum to Purchase Agreement". This document provided that the seller agreed that in the event the ore-bearing material purchases by the buyer did not produce at least $ 890 per ton of gold and/or silver, the seller would sell and the buyer would buy additional units of ore-bearing material for a nominal cash amount until either the average of $ 890 per ton is achieved or the seller has delivered twice *96 the amount originally purchased, whichever comes first. Petitioner also executed a development agreement with Bradbury Independent Mining Co. (BIMCO) and signed a promissory note payable to BIMCO in the principal amount of $ 50,000. The note recited that it was payable in 1992 with simple interest at the rate of 12 percent. Petitioner paid BIMCO $ 10,000 by check in December 1992. As maker of the note petitioner granted a security interest in his rights to minerals to BIMCO. By its terms interest on petitioner's note was payable solely from mineral proceeds. The note also provided that the maker agrees to assign as prepayment of the note 50 percent of the maker's gross mineral proceeds defined as the gross amount received from the sale of gold and silver from the maker's ore. The note was not assignable without the prior written consent of the maker. CMMC was formed in 1982 by Mr. Gary Hoffman and Mr. Bernard Aylmer. Mr. Aylmer had worked as a salesman for Mr. Hoffman on a commission basis in connection with the selling of purported investments in the North Reveille Project or Gila Mines (hereinafter sometimes referred to as North Reveille or North Reveille Project). While *97 Mr. Hoffman was selling "investments" in the North Reveille Project, he met an individual in San Diego who told him that he knew someone who wished to sell mining claims. The person referred to was Mr. Ray Hollis, who in 1966 had inherited a partial interest in a patented mining claim known as the Printer Boy Mine in the Leadville mining district in Leadville, Colorado. In 1976 Mr. Hollis acquired the remaining interest in the Printer Boy Mine from the other heir. In addition to the interest he inherited in the Printer Boy Mine, Mr. Hollis inherited some unpatented claims in the same area, including the Lucky Joe, the Little Addie, the La Compton, and the Emily. The Printer Boy Mine had been mined in the late 1800's and again in the early 1940's for gold and silver. Mr. Hollis had never done any mining on the claims. The Printer Boy Mine was worked out by the prior mining that had taken place in the 1940's. In 1982 a meeting was held between Mr. Hoffman and Mr. Hollis to discuss the purchase by Mr. Hoffman of Mr. Hollis' mining claims. Mr. Hollis gave Mr. Hoffman and Mr. Aylmer information about the properties he owned including a number of assay reports. Mr. Hoffman was *98 interested in acquiring an interest in Mr. Hollis' mining properties in order to set up an operation similar to the North Reveille Project operation. Mr. Hoffman on behalf of CMMC leased certain claims from Mr. Hollis including the Printer Boy Mine. Mr. Hoffman made no investigation of Mr. Hollis' mining properties other than reviewing information given him by Mr. Hollis prior to forming CMMC and marketing "investments" in properties stated to be leased by CMMC. Neither Mr. Aylmer nor anyone associated with Mr. Hoffman and Mr. Aylmer made any such investigation. Neither Mr. Hoffman, Mr. Aylmer, nor anyone associated with them had a geologist or mining engineer look at the property or review information with respect to the property prior to the formation of CMMC and marketing "investments" in ore-bearing materials from the mines leased by CMMC. The information Mr. Hoffman received from Mr. Hollis consisted of a large number of assay reports and information about the old workings at the various mines. Mr. Hoffman drafted a prospectus for CMMC primarily copying it from the North Reveille brochure. Mr. Hoffman selected several of the best assay reports out of the many given to him *99 by Mr. Hollis to put in the prospectus. The CMMC prospectus contained a number of errors which Mr. Hollis pointed out to Mr. Hoffman and Mr. Aylmer, but which were not corrected. The only assay report printed in the prospectus as being from the Printer Boy Mine which was in fact from that mine is one assay report on page 15 of the prospectus marked as "From Vein B". All the other assays listed as being from the Printer Boy Mine in the prospectus are from the Emily, the Little Joe, or the La Compton claims. The La Compton claim was not part of the CMMC leases. A number of the assays in the prospectus identified as being from the Printer Boy Mine were from claims not a part of the CMMC project. The assay on page 14 of the prospectus used by CMMC with respect to the Printer Boy Mine was made from material that had been concentrated by separating out waste material to produce richer assay results than would have been produced from the entire material. The prospectus is misleading in that it fails to disclose this fact, contrary to industry practices. The prospectus also contains incorrect quotations attributed to a professor at the University of Utah. Although Mr. Hollis pointed *100 out the inaccuracy of the statements attributed to this professor to Mr. Hoffman and Mr. Aylmer, they did nothing to correct the prospectus. Mr. Hollis also pointed out to Mr. Hoffman and Mr. Aylmer that the estimate of recoverable ore in the Printer Boy Mine was highly overstated and that an estimated recovery of $ 30 to $ 250 per ton was far more accurate than a recovery of $ 890 per ton. When Mr. Hollis pointed this out to Mr. Hoffman and Mr. Aylmer they told him that the $ 890 per ton figure made the project easier to sell. Another misstatement in the prospectus is the description of CMMC as operating a development project. Development implies that known quantities of minerals in economically marketable quantities existed on the CMMC properties. In fact in 1982 no such materials were known to exist and none were subsequently discovered. The prospectus inaccurately stated that gold- and silver-bearing ore was abundant in commercially marketable quantities when in fact no such ore was known to exist on the CMMC properties. CMMC referred to participants in its "investment" program as "client miners". These client miners received no actual description of the location of their *101 ore-bearing material other than that it was in the Leadville mining district. A unit sold to a "client miner" consisted of 200 tons of material, but no "client miner" was given any statement or indication of what ore-bearing material belonged to him. Mr. Hoffman came to see Mr. Tom Bradbury in the summer of 1982 and asked Mr. Bradbury if he would be interested in doing some mining work for CMMC. At that time Mr. Tom Bradbury was employed at a company which he knew was shortly going to discontinue operations and his brother Mr. Sam Bradbury was unemployed. Neither of them had extensive mining experience but had previously had some connection with mining in Leadville. After Mr. Hoffman came by to see Mr. Tom Bradbury, Mr. Tom Bradbury talked to his brother, Mr. Sam Bradbury, and they decided that they might have an interest in doing mining operations for CMMC. They formed a corporation, Bradbury Independent Mining Company (BIMCO). Mr. Hoffman did not again approach either Mr. Tom Bradbury or Mr. Sam Bradbury until October 1982 when he again contacted Mr. Tom Bradbury who at that time had Mr. Sam Bradbury with him. Mr. Hoffman told the Bradburys that he was ready for them to *102 begin mining. He told them that he wanted them to begin mining in the near future in order to qualify his "client miners" for tax deductions in 1982. Mr. Hoffman told the Bradburys that development work on the CMMC holdings should be finished in 2 years and that he contemplated that there would be approximately $ 2-1/2 million available for the mining. The prospectus stated to investors that "All mine development relative to your ore-bearing material will be completed in 18 to 24 months after execution of your contract". Mr. Hoffman and Mr. Aylmer instructed the Bradburys to begin work on the south end of the Printer Boy property. The Bradburys were told that the vein was approximately 50 feet below the surface. In fact the lease on Printer Boy at the south end area was quite narrow and in the Bradburys' opinion was not the place to begin operations. However, the Bradburys through their corporation BIMCO began tunneling work at the south end of the Printer Boy Mine as instructed. To tunnel at the south end of the Printer Boy Mine, BIMCO had to tunnel through over 600 feet of alluvial material before encountering bedrock. This alluvial material is not a host rock for gold or *103 silver. There was no possibility of locating gold or silver in any appreciable quantities in the alluvial material. BIMCO was never given any geological diagrams, maps, or other information from which to plan and conduct the work. Although Mr. Hoffman and Mr. Aylmer promised such materials to BIMCO, the materials were never delivered. Mr. Sam Bradbury was not aware that BIMCO would receive promissory notes from the client miners until he saw a copy of the final draft of the prospectus in late 1982. Mr. Tom Bradbury did not have any knowledge of the notes until BIMCO began receiving development contracts and promissory notes in the mail. BIMCO accepted the contracts and notes because the Bradburys were told to do so by Mr. Hoffman. Although by their terms the promissory notes were due in 10 years, at Mr. Hoffman's insistence Mr. Tom Bradbury signed a document granting a 10-year extension of a note for a payment of $ 100. Mr. Bradbury felt he had to sign the extension in order to get enough money from Mr. Hoffman to continue tunneling work. The fact of the availability of extensions was distributed to tax advisers and brokers along with a legal opinion and an article in a Leadville *104 newspaper. Although the promissory notes were initially due in 10 years on their face and 20 years if extended, there were no plans for BIMCO to continue with any work in the mine after the initial cash subscriptions paid by the "client miners" had been spent. BIMCO's Federal income tax returns for 1982 through 1985 did not reflect the promissory notes as an asset. Mr. Sam Bradbury thought the notes were worthless and eventually burned all of the originals. In 1985 Mr. Hoffman said to Mr. Hollis something to the effect that the promissory notes would not be paid unless there was production from the mine. Of the cash amounts paid by the various investors in the CMMC project, 50 percent went to Mr. Hoffman, Mr. Aylmer, and their salesmen for sales commissions and 10 percent went to BIMCO as a fee for the work performed in connection with the Printer Boy Mine. The remaining 40 percent was placed in an account which was controlled by Mr. Hoffman's wife. Funds from this account were released to BIMCO as needed to pay the expenses of the work it was doing at the Printer Boy Mine. In the letter at the beginning of the prospectus signed by Mr. Aylmer on stationery of CMMC dated June *105 23, 1982, the statement is made that "Section 616(a) of the I.R.S. Code permits the deduction of mining development expenses the year in which they are paid or incurred. Therefore, you may recover approximately three times your original cash outlay the very first year through your tax savings". This letter also refers to American Marketing Associates as the marketing agent for the mining project. On page 10 of the prospectus under the title You Can Be In The Mining Business, the statement is made that "The purchase of mineral rights provides a means for you to become involved in the mining business on a highly leveraged basis and to claim certain tax deductions related to the mining business". On page 21 of the prospectus under the title Questions and Answers Relative To The Mining Business, the first question is: "What is the tax write-off for the calendar year in which the purchase is made?" The answer is: "The tax write-off is 6 to 1 or 600 percent". Question 2 is: "What does 6 to 1 mean?" The answer is: "This means that the tax deduction available to you is 6 times the cash outlay paid to the company that does the mining and development of your mining property". Question *106 4 on page 21 relates to how the promissory note is to be paid. The answer states that the note may be paid from the sales proceeds of the gold and silver derived from the mining property. On page 22 the statement is made that all mine development relative to "your ore-bearing material will be completed in 18 to 24 months after execution of your contract". Question 6 also deals with the tax deduction the investor may claim. On page 23 the question is asked of what happens if the IRS disallows the mine development deduction. The answer is that it is doubtful "that this can happen". This is followed by the statement "In addition, arrangements have been made to set aside a percentage of the proceeds from each sale to establish a legal defense fund of $ 100,000". Questions 17 and 18 on page 23 also deal with the tax benefits of the transaction with CMMC. Much of the material sent out by CMMC to its salesmen also dealt with the tax advantages of investments in "ore-bearing" material through CMMC. The reason the Bradburys started their operation of tunneling into the south end of the Printer Boy Mine in late October or early November, which is an undesirable time of year to start *107 mining operations in the Leadville, Colorado area, was that they were told by Mr. Hoffman and Mr. Aylmer to start at that time on the south end. At first they did not seek the reason for wanting them to start in November, but later Mr. Hoffman told them that they had been directed to start in 1982 so that the persons who had invested in the CMMC project could take a tax writeoff in the year 1982. All that BIMCO did in connection with the Printer Boy Mine in November and December 1982 was preparation work since BIMCO had received no guidelines as to where any ore bodies had existed or would exist. This preparatory work extended into 1983. When BIMCO had received no information with respect to where to locate materials that contained ore in mid-1983, it began to undertake a drilling program itself in an attempt to locate ore in the mine. Mr. Tom Bradbury was very concerned about finding ore since he understood BIMCO was supposed to be in the process of developing ore deposits. He considered the core drilling that BIMCO was doing in 1983 to be exploration work which BIMCO was not supposed to have to do. The exploration work was supposed to have already been done when BIMCO was *108 engaged to develop the ore in the mine. The drilling work that BIMCO performed did not result in finding any ore. After BIMCO had done drilling on the Printer Boy Mine to the extent the Bradburys considered necessary to determine if there was ore available in the Printer Boy Mine, no ore in commercial quantities had been found. The most that had been discovered was a small amount of silver which was not in a quantity to make its removal commercially feasible. After finishing this process of drilling Mr. Tom Bradbury told Mr. Hoffman and Mr. Aylmer that there was no ore of minable quality in the Printer Boy Mine. Mr. Aylmer said to Mr. Bradbury: "Who's asking you to find ore?" In the late summer or fall of 1983 Messrs. Tom and Sam Bradbury consulted an attorney with respect to the mining work they were doing for CMMC investors and also with respect to their understanding that investments in the mine were still being sold. This attorney advised them that the operation might be illegal both as a tax shelter and a securities fraud and that they should immediately find an ore body, and if they could not find ore in commercial quantities in a very short time, to get out of the program. *109 BIMCO expedited its attempt to find ore. The only ore material commercially feasible to mine the Bradburys found with all their work was one small shoot about 3 feet long, relatively narrow. This shoot dipped off of the Printer Boy Mine property. In fact most of the ore in this one shoot was not on the Printer Boy Mine property. In March 1984, having been unable to find any ore to mine in the Printer Boy Mine for investors in CMMC, the Bradburys ceased any operations on the property. When they left the property they received a letter from Mr. Aylmer telling them to stay off the property. At about the same time they were contacted by an individual doing an investigation with respect to the legality of the securities being sold in the Lake County project that included the Printer Boy Mine, and it was suggested to them that they might be violating security laws by participating in the activity. Petitioner on his Federal income tax return for 1982 claimed on Schedule C a deduction for $ 60,000 as "developmental expenditures deductible as per code sec. 616". Respondent in the notice of deficiency disallowed this claimed deduction on the ground that petitioner had failed to establish *110 that any amount was paid or incurred during the taxable year for the development of a mine or other natural deposit after the existence of ores or minerals in commercially marketable quantities had been disclosed. Respondent further stated that petitioners had not established that they acquired an economic interest in any mine or mineral property or that the claimed mining transactions occurred or occurred as claimed. Alternatively, the deduction was disallowed in the year claimed because it did not clearly reflect income and, further in the alternative, the claimed deduction was disallowed because of the determination by respondent that the transaction was a sham and had no economic substance other than the purchase of a tax deduction. Still further in the alternative, the deduction was disallowed to the extent that it was in excess of the actual cash distribution to the activity because petitioner was not at risk with respect to any greater amount. Respondent also determined additions to tax as above set forth. OPINION Section 616(a) provides for a deduction in computing taxable income of expenditures paid or incurred during the taxable year for the development of a mine or *111 other natural deposit after the existence of ores or minerals in commercially marketable quantities has been disclosed. Respondent's first basis of disallowance of petitioners' claimed $ 60,000 deduction for development expenditures under section 616 in this case is that petitioners have failed to establish that any amount was paid during the year 1982 for the development of a mine or other natural deposit after the existence of ores or minerals in commercially marketable quantities had been disclosed. The record here is clear that no development of any mine in the Lake County project of which the Printer Boy Mine was a part was done in 1982. The only mine with respect to which any activity occurred in 1982 was the Printer Boy Mine. The company that did some work in connection with the Printer Boy Mine was BIMCO, which was operated by Messrs. Tom and Sam Bradbury. The stipulated exhibits in this case include the testimony at another trial of Mr. Tom Bradbury and a deposition of Mr. Sam Bradbury. Both Bradburys testified that they were directed by Mr. Hoffman and Mr. Aylmer to begin going into the south end of the Printer Boy Mine and were told they would be furnished a statement *112 with respect to location of the ore deposits. They were never furnished such statement and throughout 1982 made no effort themselves to find such ore deposits since they were following instructions by tunneling into the south end of the mine. Their testimony is explicit that they had been given no information as to the existence of ores or minerals of any kind in the Printer Boy Mine and that the work they did involved no development of a mine after the existence of ores or minerals in commercially marketable quantities had been disclosed. In addition, the expert reports stipulated into the record discuss the known information in 1982 with respect to the Lake County mining area and specifically the Printer Boy Mine and, on the basis of that information, the opinion of the expert is stated to be that there was no development work done in connection with the Lake County mining project including the Printer Boy Mine in 1982. Petitioner did not choose to testify in this case even though he was informed by the Court that the burden of proof was on him to show that he had made a payment of development expenses in 1982 and the amount of such payment. However, petitioner stated that *113 he wished to rely solely on the stipulated record. The record shows that petitioner was involved in a transaction similar to the one involved in the instant case in 1981. Answers petitioner gave to certain interrogatories which are stipulated into the record in this case show that petitioner purchased his so-called "ore material" in this case from the same individual from whom he had purchased ore material in 1981. The purported mining location differed, the mine operating company differed, but otherwise the two transactions appear to have been identical. Petitioner did testify in the case involving the year 1981, Milner v. Commissioner, T.C. Memo. 1991-464, filed September 24, 1991. Nevertheless, we concluded in that case that there was no development done for which the claimed deduction was properly allowable, and that the claimed mining operation was a sham and was totally lacking in economic substance. The stipulated materials in the instant case show that no development was done on the properties from which petitioner claimed to have purchased 400 tons of "ore-bearing material" in the year 1982, and petitioner has offered no evidence to rebut *114 the voluminous material showing that no development was undertaken. Since the burden is on petitioner to show that there was development work done in 1982, and he has failed to establish that development was undertaken on the property with respect to which he claims to have made an investment, his claimed deduction for development expense was properly disallowed. Petitioner was given the opportunity to file a brief. Other than the introductory paragraph stating the issue in the case, petitioner's brief consists of one page entitled petitioners' requests for findings of fact. The requests are three in number. The first states that petitioner invested in a gold and silver mining business with CMMC in December 1982 and that stipulated documents and testimony establish that this business was in operation in Lake County, Colorado, and that it contracted with BIMCO to extract ore-bearing material from the Printer Boy Mine. The second requested finding is that petitioner invested in CMMC because he believed that this investment would return a profit, that the investment was made in good faith, and that petitioner expected CMMC and BIMCO to proceed with the mining operation and produce *115 gold and silver in marketable quantities. The third requested finding is that petitioner is entitled to the $ 60,000 "investment claimed on his 1982 income tax return" as submitted. Then he further states that if in fact the $ 50,000 promissory note was destroyed by Mr. Samuel Bradbury as stated in stipulated testimony from a previous trial, petitioner must include the $ 50,000 as income on his next tax return for 1992. Petitioner makes no argument in support of these requested findings and it is clear from the record that neither CMMC nor BIMCO did any development work in connection with the Lake County project including the Printer Boy Mine in 1982. There is no evidence in this record to support petitioner's requested finding that he believed the $ 60,000 investment in CMMC would return a profit. In fact there is no testimony by petitioner, and the stipulated documents do not support petitioner's contention that his motive in investing in CMMC was to make a profit. The materials furnished to petitioner in connection with the investment support the conclusion that an investor could not reasonably have had a belief that the investment would return any profit other than the tax *116 benefits discussed in the material. The final requested finding by petitioner is an ultimate finding not justified by the record. Since petitioner has failed to show that any development was done on the Printer Boy Mine or any other mine in Lake County in 1982 and the evidence affirmatively shows that it was not, we could conclude our discussion here. However, since respondent's brief deals extensively with the voluminous evidence stipulated into this record that shows that the whole CMMC transaction was a sham and was totally lacking in economic substance, we consider it appropriate to state our views in this regard. Petitioner's 1981 case, Milner v. Commissioner, supra, involved an investment by petitioner through American Precious Metals in the North Reveille Project in a transaction identical to that involved in the instant case except for the names of some of the persons involved and the location of the property. We therefore consider it appropriate to have a limited discussion of our basis for concluding that the Lake County project, just as the North Reveille project involved in the American Precious Metals transaction, was a sham lacking *117 in economic substance. Since the legal analysis in Milner v. Commissioner, supra, applies in its entirety to the situation here, we will not go into detail concerning the lack of substance in the CMMC transactions. We point out, however, that our facts show that the promotional materials furnished by CMMC clearly focused upon and highlighted the tax benefits as did the materials in the 1981 case. The record also shows that petitioner undertook no negotiations with respect to the purchase agreement or development agreement but merely signed the papers given to him. The record here shows that the right petitioner claims to have purchased was to extract ore-bearing materials, and that no specific area for such extraction or how it was to be done or where the materials were to come from was specified in the agreement. The record also shows that numerous known inaccuracies were included in the materials furnished to petitioner and petitioner made no investigation of the material handed to him. The record shows here, just as in the prior case, that the major portion of the consideration was by a promissory note. It is reasonably clear from this *118 record that it was never intended that this note be paid. The record shows that the promoters of the project knew no ores in quantities commercially feasible to mine were on the property. The record shows that BIMCO, to whom the notes were given, considered them to have no value and actually destroyed them. There is nothing in the record in this case to support petitioner's contention that he had a profit motive in his investment in CMMC. However, under the facts here present petitioner's objective might well not be controlling. As we pointed out in Cherin v. Commissioner, 89 T.C. 986, 993 (1987), a transaction devoid of economic substance is not recognized for tax purposes, and it is the substance of the transaction which determines its tax consequences. We pointed out that we had never held that the mere presence of an individual's profit objective would require us to recognize for tax purposes a transaction which lacks economic substance, and that the economic substance of a business transaction and the intent or motive of the individual investor are not identical. We stated that a business transaction by its very nature must have economic substance, *119 citing James v. Commissioner, 87 T.C. 905, 924 (1986), affd. 899 F.2d 905 (10th Cir. 1990). The case of Cherin v. Commissioner, supra, involved an effort by the taxpayer to make a distinction in the facts there involved and the facts in three previous cases decided with respect to an identical transaction involving the same promoter. We concluded that the transaction in the Cherin case was not distinguishable from the transactions in the prior cases and held as we had in the prior cases. We believe it would serve no useful purpose to again analyze and discuss all of the cases we discussed in Milner v. Commissioner, T.C. Memo. 1991-464. What we stated there with respect to the economic substance of the transaction is equally applicable here to a similar factual situation. We therefore conclude that petitioner is not entitled to the claimed deduction of $ 60,000 for development expense, and we need not discuss the other grounds argued by respondent in support of the disallowance of the claimed deduction. Petitioner offered nothing to refute respondent's *120 determination of additions to tax under sections 6653(a)(1) and (2) and 6661, and of additional interest under section 6621(c), for the year 1982. Because of petitioners' failure to show error in these determinations, we sustain the determinations of respondent. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩