ROBERT J. GAMPP, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gampp v. Commissioner
Docket No. 16968-87
United States Tax Court
T.C. Memo 1991-548; 1991 Tax Ct. Memo LEXIS 596; 62 T.C.M. (CCH) 1141; T.C.M. (RIA) 91548; November 4, 1991, Filed *596 Decision will be entered for the respondent. Robert T. Gilleran, for the petitioner. Irvin W. Fegley, Barbara M. Leonard, and Peter Bakutes, for the respondent. DAWSON, Judge. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION This case was assigned for trial or other disposition to Special Trial Judge James M. Gussis pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. All section references are to the Internal Revenue Code as amended and as in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GUSSIS, Special Trial Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes, together with, increased interest and additions to tax: Increased
Interest
Additions to Tax, Sections
Year
Deficiency
6621(c)
6653(a)
6653(a)(1)
6653(a)(2)
6661
1979
$ 979
applicable
$ 49
N/A
N/A
N/A
1980
5,949
applicable
297
N/A
N/A
N/A
1981
3,550
applicable
N/A
$ 178
*
N/A
1982
7,839
applicable
N/A
392
* *
$ 1,960
1983
6,903
applicable
N/A
345 * * *
1,726
*597 The issues are (1) whether respondent correctly disallowed deductions claimed by petitioner in the years involved for certain development expenses pursuant to section 616; (2) whether petitioner is liable for the additions to tax under sections 6653(a) and 6653(a)(1) in the years 1979 through 1983 and under section 6653(a)(2) in the years 1981, 1982, and 1983; (3) whether petitioner is liable for additions to tax under section 6661 in 1982 and 1983; and (4) whether petitioner is liable for the increased interest under section 6621(c). Petitioner claimed a mine development expense deduction on his 1982 Federal income tax in the amount of $ 126,000. He carried back the unused portion of the net operating loss generated by the mine development expense in 1982 to the *598 taxable years 1979, 1980, and 1981. Petitioner carried forward to 1983 the remaining unused portion of the net operating loss. Petitioner also claimed a mining development expense deduction on his 1983 return in the amount of $ 12,600 representing the ratable portion of the purported mine development expense in 1983 in the total amount of $ 126,000 which petitioner elected to deduct over a period of 10 years pursuant to section 58(i). Respondent disallowed in full the mining development expenses claimed by petitioner in 1982 and 1983. The deficiencies determined for 1979, 1980, and 1981, and partially for 1983 are attributable to the disallowance of the net operating carryback and carryforward losses to those years. Petitioner now concedes that he is not entitled to deductions for mining exploration expenses under section 616 to the extent that such deductions are based on purported loans supposedly obtained by petitioner from an entity called Interocean Financial, Ltd., in connection with his purchase of mineral ore blocks under the so-called Petro West program. Petitioner concedes that such purported financing was derived from a circular flow of funds which may be disregarded *599 for tax purposes. FINDINGS OF FACT Petitioner was a resident of Redlands, California, at the time the petition herein was filed. Petro West Resources, Inc. (hereinafter Petro West) was incorporated in the State of Nevada on December 14, 1981, with the following board of directors: Douglas W. Norman, John R. Krushnisky, and Robert F. Callju. Mr. Norman, who owned all of the Petro West stock, had been involved in several mining operations in Canada and in the United States. Robert Salmon became vice president and general manager of Petro West early in 1982. Philip B. Smith was employed by Mindamar from about May 1982, to about November 1983, eventually becoming general manager. He had previously worked for Petro West for a brief period. Petro West offered to sell blocks of mineral ore in a placer gold mine in the State of California. The blocks of ore were a part of certain mining claims located in Kern County and San Bernardino County, California. The mining claims, hereinafter called the Petro West claims, were subleased by Petro West. The subleased Petro West claims were a portion of certain claims (hereinafter the Cole claims) in this area which had been assembled over *600 the years by one Darrell V. Cole, who is survived by his wife Harriet Cole. Petro West qualified to transact business in California on April 5, 1982. The corporation forfeited its right to transact business in California on November 1, 1984, for not complying with statutory requirements. Petro West filed a Federal income tax return for the taxable year ending October 31, 1982, on January 20, 1983. Petro West did not file returns for the taxable years ending October 31, 1983, through 1987. Mindamar Resources, Inc. (hereinafter Mindamar) was incorporated in the State of Nevada on December 23, 1981, and qualified to transact business in California on March 5, 1982. Mindamar was to function as a mining contractor to provide development, mining, and refining for the blocks of mineral ore sold by Petro West. In or about September 1983, LILTEK Incorporated was commissioned by Mindamar to perform a site survey of the Mindamar gold recovery plant. LILTEK Incorporated made various recommendations in October 1983, to meet the inadequacies in the plant operations. Mindamar forfeited its right to do business in California on March 1, 1984. Mindamar did not file Federal income tax returns *601 for the taxable years 1982 and 1983. Interocean Financial, Ltd. (hereinafter Interocean), was incorporated in the State of Nevada on May 14, 1982. The ostensible purpose of the corporation was to provide financing to purchasers of mineral ore blocks to be used for the development of such mineral ore blocks. Interocean forfeited its corporate charter in Nevada on February 1, 1989, for failure to comply with certain statutory requirements. Interocean, Mindamar, and an entity called Graystone Financial Group, Inc., were involved in the circular flow of funds which ostensibly provided financing to investors for the development of their mineral ore blocks. Prior to 1979, Harriet Cole and her husband had located or acquired 23 unpatented placer mining claims and some 33 unpatented lode mining claims and fractional lode mining claims in San Bernardino and Kern Counties, California. From 1953 to 1956, the Lila King Mining Co. was engaged in mining gold from both placer and lode deposits on the Cole claims. Prior to 1964, a portion of the Cole claims was leased, with an option to buy, to one Charles Rankin and an associate. From 1964 through 1966, the Cole claims were leased to Shell *602 Oil Company which conducted a complete title search on all of the claims to certify their validity. From 1966 through 1971, the Cole claims were leased, with an option to buy for $ 1,000,000, to Mines Exploration Company. Mrs. Cole terminated the lease when Mines Exploration Company stopped making payments. Chemical Coatings Company leased the Cole claims from 1974 through 1977. In 1977, one Jack Norman, his brother Douglas Norman, and other individuals formed Sleeping Giant Mines, Ltd., in British Columbia, Canada, to conduct mining operations at a new location. In 1978 or 1979, Douglas Norman was retained as consultant for a West German mining company interested in the location of base metals, primarily tungsten. On behalf of the West German company, Douglas Norman went to the Atolia-Randsburg district in California to ascertain the availability of claims that could be leased or acquired. In or about 1979, Golden Giant Mines, Inc., a California corporation, was formed. Sleeping Giant Mines, Ltd., acquired 50 percent of the stock, Bruce Purcell and Daniel Rhoades, (through Trans-Bay Development Corporation) 40 percent, and the Norman brothers 10 percent. Subsequently, the *603 Trans-Bay Development Company held 50 percent of the stock, with the remaining 50 percent held by Sleeping Giant Mines, Ltd., Mr. Purcell was president of Golden Giant Mines, Inc., and Douglas Norman was vice president. In 1979, Golden Giant Mines, Inc. (hereinafter Golden Giant) and Metallgesellschaft, the West German mining company, formed a joint venture to lease certain Cole claims. After months of exploration and expenditures of approximately $ 500,000, the West German mining company withdrew from the joint venture due to the low levels of tungsten that were found. In February 1980, Golden Giant entered into a lease-option agreement with Mrs. Cole with respect to the Cole claims with an option price of $ 1,000,000, an advance royalty of $ 50,000, and monthly payments of $ 5,000 which were creditable against the option price. In June 1980, with the written consent of Mrs. Cole, Golden Giant entered into a joint venture agreement for the development and exploration of the Cole claims with Kandex Resources and Development, Ltd. (hereinafter Kandex), a Canadian corporation. Pursuant to this joint venture agreement, the parties incurred expenditures for sampling and testing work *604 on the Cole claims. Later in 1980, the joint venture was terminated by Kandex. In connection with the termination of the joint venture, Golden Giant, with the consent of Mrs. Cole., granted to Kandex a deed of trust against the Cole claims to secure repayment of $ 340,000 to Kandex. In its promotional brochure entitled "Your Investment In California Gold," Petro West described the two mining plans that were available to prospective purchasers of blocks of mineral ore. Said blocks of ore were to be selected from a system of grids and blocks which had been surveyed and marked on the portions of the Cole claims where Petro West intended to engage in its sales efforts. The blocks were located in an area designated as the Baltic Channel. Under Plan One, a purchaser would (1) acquire a block of "mineral ore" (10,000 tons) for $ 6,000 plus a royalty of 32 percent of the mineral recovery, (2) contract with a mining company (usually Mindamar) to process the ore at a rate of $ 10.50 per ton, and (3) obtain a loan from Interocean which was to be used to pay for development costs. A purchaser also had the option under Plan One to mine his own ore. Under Plan Two, the loan from Interocean *605 was not included in the package. Under Plan One, the tax advantage ratio inuring to a purchaser of a block of mineral ore was described as approximately four-to-one. Plan Two would purportedly allow a deduction of one-to-one. On December 30, 1982, petitioner acquired three 10,000-ton blocks of alluvial ore under Plan One of the Petro West program, executed mining services contracts with Mindamar to process the three blocks, and financed the development aspects of the mining services through Interocean. Petitioner paid $ 6,500 for each of the three blocks, for a total of $ 19,500. The contractual development cost for each block of ore was indicated as $ 42,000. Petitioner made a payment of $ 4,500 for each block, and the balance of $ 37,500 for each block was financed through Interocean. Petitioner paid a total of $ 13,500 to Mindamar in 1982 for the mining services, and he executed promissory notes in the total amount of $ 112,500 payable to Interocean for the amounts purportedly supplied by Interocean to Mindamar to cover development costs. The applications to purchase blocks of ore which were executed by petitioner stated that "I have read and understand your brochure entitled *606 'Gold In America' and/or 'Your investment in California Gold' and/or the Purchase Agreement." The applications to purchase mineral ore also stated in part as follows: (2) I understand that it will be my responsibility to perform or have performed for me within the time limits specified in the Purchase Agreement all work necessary to obtain the gold, silver, tungsten or other minerals from the Mineral Ore I purchase from you. I therefore agree to consult a competent mining engineer to advise and guide me in making decisions regarding the development, mining, extracting, processing, concentrating, transporting, smelting and refining of the Mineral Ore I am offering to purchase from you. * * * (9) I also understand that you have provided the Standard Mining Contract only for my convenience to indicate the terms on which one reputable mining company, is prepared to perform the development, mining, processing, concentrating, extraction, transportation, smelting and refining work for me. I will have to decide, after consulting my mining engineer, whether to enter into an agreement with said mining company * * * (10) * * * After my purchase, Petro West's activities will be *607 limited to designating the specific blocks of Mineral Ore to which I will have title, recording my ownership * * *
The Petro West Ore Purchase Agreements executed by petitioner provided in part as follows: (8) Mineral Ore sold to Buyer will be designated in rectangular blocks containing a minimum of 2,500 Tons of Mineral Ore * * * Seller shall provide Buyer with a Certificate of Ownership for his Mineral Ore. Buyer's Mineral Ore shall be his legal property, with each Block purchased hereunder designated and recorded in Buyer's name in the maps and documents of Seller and appropriate governmental agencies, as determined by the Seller. Mineral Ore sold to Buyer shall be his to enjoy within the scope of this sale agreement. Upon completion of mining, or failure to comply with any purchase agreements entered into with Seller, or, upon termination of six (6) years from date of purchase, whichever shall occur first, all rights and title of ownership conveyed to Buyer under this Purchase Agreement shall automatically reconvey back to the favor of the Seller. (9) Seller retains the right to substitute Blocks in the event Seller has reason to believe that an original or previously *608 substituted Block sold to Buyer will produce substantially less than $ 22.50 per ton in Net Smelter Values or that the due development and mining of such original or previously substituted Block is or becomes impracticable * * * * * * (16) * * * Buyer represents that he will not commingle his Mineral Ore with that of other Buyers or in any way relinquish or diminish his control, or that of his agents, over the Mineral Ore or the products derived therefrom.
A purchaser of mineral ore blocks under either plan could purchase an optional limited warranty that the mineral ore sold to him should contain an average of $ 22.50 net smelter value per ton under Petro West mining Plan One. If the original block of ore did not produce the stated net smelter value, Petro West agreed to sell an additional amount of mineral ore to the purchaser. The Mindamar Standard Mining Contract -- Plan One (1), executed by petitioner, in which a purchaser of an ore block was designated as the "owner" and Mindamar as the "contractor," provided in part as follows: WHEREAS, owner desires Contractor to perform the mine development, mining, processing and refining of 10,000 Tons of Mineral Ore *609 containing gold, silver and/or other minerals ("The Mineral Ore") located at such designated areas within the Mining Claims as will be set forth in Schedule "A" to be attached hereto and incorporated herein; * * * NOW THEREFORE, in consideration of the premises and upon the following terms and conditions, the parties hereto agree: (1) For mine development work (defined as all steps required to make the Mineral Ore ready and accessible for mining), Owner agrees to pay Contractor the total sum of $ 4.20 per Ton (Total $ 42,000) by delivering Owner's check in the amount of $ 0.45 per Ton (total of $ 4,500) herewith and $ 3.75 per Ton ($ 37,500) within 30 days of the date hereof or before January 5 of the year following the date of this contract, whichever is the earlier date. (2) For mining and extracting Owner's Mineral Ore (defined as all procedures at the mine site used to extract the Mineral Ore from the ground and to transport the Mineral Ore to a processing facility) the Owner agrees to pay Contractor a base price of $ 3.50 per Ton (total of $ 35,000) and authorizes Contractor to deduct such mining costs from Owner's Net Smelter values remaining after payment *610 of the royalty obligation set forth in Paragraph 5 hereof. The aforesaid base price shall be adjusted in accordance with Paragraph 4 hereof. (3) For processing and concentrating (defined as all procedures, including crushing, milling, concentrating, and chemical treatment necessary to prepare the Mineral Ore for delivery to a commercial smelter or refinery), transportation to a commercial smelter or refinery and the arranging for (a) the smelting and refining of the Mineral Ore and (b) conversion of such gold and silver as are derived therefrom into bullion of not less than 0.9995 fineness for gold and not less than 0.990 fineness for silver and conversion of such nonprecious minerals as is derived therefrom into saleable concentrates. Owner agrees to pay Contractor a base price of $ 2.80 per ton (total $ 28,000) and authorizes Contractor to deduct such costs of processing, concentrating, transporting and making arrangements for smelting and refining from Owner's Net Smelter Values remaining after payment of the royalty obligation set forth in Paragraph 5 hereof. The aforesaid base price shall be adjusted in accordance with Paragraph 4 hereof. * * * (5) Owner declares *611 that he is obligated to pay an overriding royalty equal to thirty-two percent (32%) of all "Net Smelter Values" (as hereinafter defined) to Petro West Resources, Inc. * * * * * * (7) Contractor agrees to commence mine development work immediately after the execution and delivery of this Contract and in any event not later than December 31, in the same year of the date of this contract and shall obtain any permits and approvals required to commence mine development work on or before such date. * * * (8) Contractor warrants that it is an independent Contractor and has no interest in the Mineral Ore or the proceeds to be derived therefrom, except for Contractor's fees as set forth herein. Contractor further warrants that it has no financial interest in or control of Petro West and that Petro West has no financial interest in or control of Contractor. (9) Contractor understands Owner has engaged or will consult with a mining engineer to assist Owner in making decisions with regard to developing, mining, processing, concentration, smelting and refining the Mineral Ore. Contractor agrees to keep such mining engineer informed of Contractor's activities and will consult with *612 such mining engineer with regard to any decisions which Owner may be required to make.
Under the Standard Mining Contract-Plan Two, the contractor agreed to perform the mine development, mining, processing, and refining of the 10,000-ton block of mineral ore for a downpayment of $ 5,250, and, in addition, the contract provided for a back-end charge of development work of 80 ounces of gold. The Petro West promotional brochure described the income potential under Plan One as follows: Estimated Income Potential
Warranted Minimum Return
Expected Average Return
A. 1 unit (10,000 Tons) at
B. 1 unit (10,000 Tons)
warranted minimum
at .08oz./Ton
of $ 22.50 per ton
Average ($ 32.00
10,000 Tons at $ 22.50
$ 225,000
at $ 400.00 Gold)
Less 32% Royalty
72,000
10,000 Tons at $ 32.00
$ 320,000
Gross Net
153,000
Less 32% Royalty
102,400
Less $ 10.50 Mining
Gross Net
217,600
& Development
105,000
Less $ 10.50 Mining
Warranteed [sic]
& Development
105,000
Minimum Return
$ 48,000
Expected Net Return
$ 112,600
In 1983, petitioner acquired several additional blocks of alluvial ore from Petro West. On February 3, 1983, he acquired two 10,000-ton blocks of alluvial *613 ore under Plan Two and made a payment of $ 6,500 for each block. Petitioner also executed the standard mining contract with Mindamar for the mine development, mining, processing and refining of the blocks of ore for a downpayment of $ 5,250 and an additional 80 Troy ounces of gold per a 10,000-ton block of ore. On March 22, 1983, petitioner acquired three 10,000-ton blocks of alluvial ore from Petro West under Plan One and made a payment of $ 6,500 for each block. He also executed the standard mining contract with Mindamar for the mine development, mining, processing, and refining the blocks of ore for a total cost of $ 42,000 for each block, with $ 37,500 of this amount to be financed through Interocean. On July 28, 1983, petitioner acquired a 2,500-ton block of alluvial ore under Plan Two. Petitioner made a payment of $ 1,875 for the 2,500-ton block and also agreed to pay an overriding royalty of 32 percent of Net Smelter Values. Petitioner executed a standard mining contract with Mindamar to process the 2,500-ton block of ore. He made a payment of $ 1,312 for the mine development work and also agreed to pay 20 ounces of gold for such work. Interocean advised petitioner *614 with respect to his acquisitions of blocks of ore in 1982 and 1983 under Plan One that his promissory notes were funded and that payments had been made to Mindamar. The parties have agreed that such funding was circular in nature and that the loans may be disregarded for Federal tax purposes. On February 8, 1980, Mrs. Cole leased a number of placer claims, previously designated herein as the Cole claims, to Golden Giant. The Petro West claims involved herein are included within the aforesaid Cole claims. On June 21, 1980, Golden Giant entered into a Joint Venture Agreement with Kandex to mine and produce minerals from mineral claims in the Atolia-Rand area of California, which included the claims leased from Mrs. Cole. On February 13, 1981, Golden Giant and Kandex agreed to terminate the joint venture agreement as of December 20, 1980. The termination agreement obligated Golden Giant to pay a stated amount to Kandex. On June 23, 1981, Golden Giant transferred a 75-percent undivided interest in the Cole claims to Geospec Ventures International, Inc., a Nevada corporation (hereinafter Geospec). In consideration for the transfer, Geospec agreed to perform certain acts recited *615 in the agreement, including the obligation to make certain payments to Golden Giant. The June 23, 1981, assignment of the 75-percent interest in the Cole claims by Golden Giant to Geospec provided that Geospec would have the right to reassign its interest. However, such reassignment would not be binding on Golden Giant unless Geospec gave written notice of such reassignment and, within 15 days after such written notice, Golden Giant did not make reasonable objection to said reassignment. The Golden Giant-Geospec assignment was made subject to the prior Golden Giant-Kandex termination agreement of February 13, 1981, and Geospec agreed to assume the obligations to make payments pursuant to the Golden Giant-Kandex termination agreement. Pursuant to the Golden Giant-Geospec assignment, Geospec also agreed to make monthly payments of $ 5,000 to Mrs. Cole pursuant to the Golden Giant-Mrs. Cole lease-option agreement and also agreed to pay an outstanding obligation of $ 30,000 owed by Golden Giant to Mrs. Cole. On or about July 15, 1981, Geospec executed a quitclaim deed to Golden Giant with respect to the aforesaid 75-percent undivided interest in the Cole claims, which Geospec tendered *616 to an escrow holder as security for the performance of its obligation under the June 23, 1981, agreement with Golden Giant. On June 23, 1981, Geospec agreed to purchase from Sleeping Giant in Canada a recovery plant purportedly developed and built by Sleeping Giant. The plant, which purportedly contained various systems for cleaning and recirculating water used in ore processing, was never brought from Canada. By October 5, 1981, Geospec began to default on its obligation to make requisite payments to Golden Giant. Geospec did not cure its defaults and, consequently, the escrow holder delivered the quitclaim deed to Golden Giant which filed said quitclaim deed with the appropriate county recorders on October 6 and 7, 1982. On October 23, 1981, Geospec executed an agreement purporting to transfer various portions of its 75-percent undivided interest in the Cole claims to (1) Mindamar Energy Resources, Ltd., a Canadian corporation, (2) Petro West Company, Ltd., a British West Indies corporation, and (3) John R. Krushnisky, d.b.a. Petro West Corporation. Pursuant to said agreement, Geospec assigned to Mindamar Energy Resources, Ltd., the right to 50 percent of net profits from *617 the mining and processing of minerals from certain designated portions of the Cole claims, subject to the right of Petro West Company, Ltd., to process designated amounts of alluvium from those portions of the Cole claims. Mindamar Energy Resources, Ltd., later assigned such rights to Mindamar. Pursuant to said agreement, Geospec assigned to Krushnisky a 70-percent net profit interest in the mining and processing of minerals from other designated portions of the Cole claims. By agreement dated December 15, 1981, John R. Krushnisky, d.b.a. Petro West Corporation, assigned his interest in the Cole claims to Petro West. The Cole claims involved in this assignment from John R. Krushnisky to Petro West did not pertain to the claims involved in the Petro West selling program of mineral ore blocks to petitioner and to the other investors in the Petro West program. Pursuant to the December 15, 1981, agreement, Petro West acquired the right to mine and process 6 million tons of alluvium, as well as the right to mine and process additional tonnage of alluvium for additional consideration. Also on December 15, 1981, Petro West Company, Ltd., assigned its rights obtained under the October *618 23, 1981, agreement to mine specified amounts of alluvium from designated portions of the Cole claims to Petro West. The Cole claims encompassed by this assignment were the same claims involved in the assignment from Geospec to Mindamar Energy Resources, Ltd., and the mineral ore blocks subsequently sold to petitioner and to other investors in the Petro West program were located on this group of Cole claims. By letter dated January 7, 1982, to Geospec, Golden Giant documented various perceived performance defaults in the June 23, 1981, agreement between Geospec and Golden Giant. The defaults included the following: (1) The failure of Geospec to review the necessary mining permits on the projects; (2) misrepresentations made in the "California Gold" prospectus concerning the purported values of mineral ore on the Cole claims attributed to the so-called Purcell report; and (3) lack of official notification to Golden Giant as to the participation and activities of Petro West and Mindamar on the Cole claims. The letter further stated: Geospec Ventures International was to have paid Golden Giant Mines 25% of the net profits from the mining operation. The addendum to the Agreement *619 did not alter the intent of the above and therefore, there is an impossibility of delivering to any investor what is purported to be 100% value in the California Gold perspectus [sic]. Notwithstanding the 32% royalty as set forth in the perspectus [sic], no investor appears to have been appraised of the 25% undivided interest that Golden Giant Mines retained on the entire Cole property, thus indicating lack of disclosure to the investment community. Furthermore, in accordance with Paragraph 11 of the first addendum, Golden Giant Mines was to have received a 25% portion of all monies or other income obtained irregardless [sic] of the mining operations and in accordance with Paragraph 16, we are further to have been supplied with the list of names of all persons and the amount of each transaction which hasn't been provided to us. It is our interpretation that the California Gold plan is fraudulent and therefore any funds obtained by such misrepresentations were not obtained legally and cannot be accrued to the benefit of Golden Giant Mines.
In or about November 1982, Geospec filed a petition in bankruptcy in the United States Bankruptcy Court, District of Nevada. On January *620 7, 1983, the attorneys for Geospec notified Petro West Company, Ltd., that any interest it had obtained in the Cole claims pursuant to the October 23, 1981, agreement was terminated as of January 7, 1983. The January 7, 1983, notification of termination from Geospec was purportedly based on the Bankruptcy Court adjudication. Petro West was also notified by the Geospec attorneys on January 7, 1983, that the agreement dated October 23, 1981, between Geospec and the three entities listed above as assignees of interests in the Cole claims was terminated, and further, that Petro West had no further right, title, or interest in the real property described under the October 23, 1981, agreement. On January 28, 1983, the United States Bankruptcy Court ruled that the interests of Geospec, Mindamar, and Petro West in the Cole claims had not been terminated. In October 1983, the United States Bankruptcy Court ordered Geospec to make certain payments to Mrs. Cole on or before December 1, 1983, and on January 12, 1984. The Bankruptcy Court further ordered that, in the event such payments were not made, the lease pertaining to the Cole claims would be considered rejected and the stay lifted *621 without further order of the Bankruptcy Court other than an affidavit by Mrs. Cole that such payments had not been received. By affidavit dated January 12, 1984, Mrs. Cole notified the Bankruptcy Court that the January 12, 1984, payment had not been received by her. In early January 1983, Petro West undertook to purchase the Kandex rights under the Golden Giant-Kandex termination agreement and deeds of trust. This was accomplished through an agreement executed on January 18, 1983, between Kandex (as assignor) and B.E.D. Investments, Ltd., a Nevada corporation, which had been formed at the instigation of Douglas Norman. On February 3, 1983, B.E.D. Investments, Ltd. (hereinafter BED), notified Golden Giant that BED had acquired the Kandex rights. On February 9, 1983, BED also notified Mrs. Cole that it had acquired the Kandex rights. During 1983, Petro West and Mindamar continued to make lease payments to Mrs. Cole which were due under the lease-option agreement between Mrs. Cole and Golden Giant with respect to the Cole claims. In January and February 1984, Mrs. Cole refused to recognize any rights of Petro West and BED to the Cole claims and refused to accept the offers of Petro *622 West and BED to assume the earlier lease agreements between Mrs. Cole and Golden Giant. On January 2, 1984, Mrs. Cole and Golden Giant executed an amendment to the February 8, 1980, lease-option agreement pertaining to the Cole claims under which Golden Giant was granted an extension to cure all existing defaults under the February 8, 1980, agreement by February 12, 1984. The defaults were not timely cured and the February 8, 1980, lease agreement between Mrs. Cole and Golden Giant lapsed. On March 12, 1984, Mrs. Cole and Inspiration Mines, Inc., a Delaware corporation, executed a lease-option agreement with respect to the Cole claims in San Bernardino and Kern counties. Upon execution of the March 12, 1984, agreement, Mrs. Cole received a payment of $ 115,000 from Inspiration Mines, Inc. On March 23, 1984, Mrs. Cole and Inspiration Mines, Inc., filed a civil action in the Superior Court of the State of California (Kern County) against, inter alia, the defendants Petro West, Mindamar, B.E.D., Robert Salmon, and Douglas Norman, seeking a court determination that the rights of the defendants in the Cole claims were null and void. On July 3, 1984, the civil complaint was dismissed *623 at the request of Mrs. Cole and Inspiration Mines, Inc. On July 10, 1984, Inspiration Mines, Inc., assigned its rights and obligations under the March 12, 1984, lease-option agreement to Golden Giant. In May 1985, Mrs. Cole and Golden Giant filed complaints in unlawful detainer as to possession of the real property encompassing the Cole claims in the Superior Court of California (Kern County and San Bernardino County) against several defendants, including Robert Salmon, Leo Burt, Jr., Petro West, Douglas Norman, and Mindamar. The Petro West mining claims are generally known as desert placer, or fanglomerates. A fanglomerate is a type of alluvium found in desert areas. A geological study of the Cole leases, Atolia Mining District, San Bernardino and Kern Counties, California, was prepared in November 1979 by Purcell, Rhoades & Associates for a joint venture between Metallgesellschaft Canada Limited and Golden Giant. Bruce G. Purcell, a registered geologist, was president of Golden Giant at the time of the study. The study included the systematic mapping of the area from which large samples of alluvium were taken and tested in accordance with technical procedures such as measured *624 drilling and triangulation as well as other procedures designed to approximate actual mine operations. The purpose of the study was to determine the values of gold and scheelite that existed in the alluvium section, i.e., above the bedrock, of the Cole leases and to determine the actual volume of the alluvium available within the boundary limits. The ore samples examined by the Purcell study covered only the southern portion of the Petro West claims. Such sampling studies were not a reliable basis for extrapolating values in the remaining central and northern areas of the Petro West claims because of the erratic nature of mineral deposits in desert fanglomerates. In October 1983, the Kern County District Attorney's office had initiated inquiries into possible false and misleading representations and advertising by Mindamar and Petro West as well as certain other entities. In November 1983, the business premises of Petro West and Mindamar were searched in the course of the investigation pursuant to a judicially approved search warrant, and certain materials, including a variety of documents, were removed from the premises. In November 1983, Douglas Norman, Robert Salmon, Philip *625 Smith, Petro West, Mindamar, and Interocean were indicted on some 25 counts, including felony counts, in connection with the activities of Petro West. On November 13, 1985, the District Attorney's office for Kern County filed an information in the Superior Court of the State of California, Kern County, against Douglas Norman, Robert Salmon, Philip Smith, Petro West, and Mindamar charging the aforementioned with the 25 counts. On March 9, 1988, Douglas Norman and Robert Salmon pled nolo contendere to two misdemeanor charges. The felony counts were dismissed. Douglas Norman and Robert Salmon were sentenced to 1-year summary probation. On October 24, 1985, the District Attorney's office for Kern County filed a motion for summary judgment for permanent injunction, restitution and civil penalties against Douglas Norman, Robert Salmon, Philip Smith, Petro West, Mindamar, and Interocean. On December 13, 1985, the Superior Court of the State of California, Kern County, entered an order of summary judgment granting injunctive relief and ordering Douglas Norman, Robert Salmon, Philip Smith, and Mindamar to make full restitution of funds invested by some 651 investors. Douglas Norman, *626 Robert Salmon, Philip Smith, and Mindamar were also made jointly and severally liable for certain civil penalties. Two blocks of mineral ore acquired by investors were purportedly mined by Mindamar. The East Kern County Historical Society, which had acquired a block of mineral ore from Petro West, was presented with a gold bar in or about November 1983, and it was reacquired by Petro West in November 1983, for a payment of $ 15,339.69. In or about October 1983, a second investor also received an unspecified amount of gold which came from various different locations on the plotted Petro West claims. Apart from the above, Mindamar did not mine any investor blocks of mineral ore under the terms of the Petro West program. A Mindamar plant on site was used largely as a demonstration for prospective investors in the Petro West ore blocks. In the latter part of 1983, Mr. Krushnisky resigned as president of Mindamar and was replaced by Robert Ross Dion. In May 1984, Mr. Dion directed the Mindamar general manager, Mr. Smith, to assist one Earle R. Ball in securing all the Mindamar assets. Mr. Ball thereafter commenced removing some of the Mindamar equipment from the mine site. Petro *627 West represented in its promotional materials that the Petro West claims contained substantial alluvium ore with mineral values in excess of $ 32 per cubic yard. The Petro West promotional materials claimed that the representation of $ 32 per cubic yard was based on the Purcell study, done by geologists Bruce Purcell and Daniel Rhoades, of Purcell, Rhoades & Associates, for Golden Giant. Mr. Purcell repudiated the claim made by Petro West. He considered the representation of $ 32 per cubic yard a false representation of the value and specifically requested Douglas Norman to retract the claim. In a letter to the California City Chief of Police dated February 11, 1982, Mr. Purcell again repudiated the $ 32 per cubic yard figure used in the Petro West materials. He stated that the mining area covered by his report showed a value of about $ 6 per cubic yard rather than $ 32 per cubic yard. OPINION In 1982 and 1983, petitioner acquired designated blocks of mineral ore from Petro West in a placer gold mine located in California and also entered into certain contractual arrangements with the Mindamar mining company. In connection with these transactions, which are described in a *628 Petro West brochure called "Your Investment in California Gold," petitioner claimed deductions in 1982 and 1983 for mining development expenses under section 616, as well as resulting loss carrybacks to 1979, 1980, and 1981, and a loss carryforward to 1983, which were disallowed by respondent. Petitioner has the burden of proof. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Where a transaction is entered into solely for tax benefits and without any other purpose, the transaction will be disregarded for tax purposes. Gefen v. Commissioner, 87 T.C. 1471, 1490 (1986). A transaction will be recognized, however, if it has economic substance. Estate of Thomas v. Commissioner, 84 T.C. 412 (1985). In deciding whether a transaction is devoid of economic substance, the taxpayer's subjective statement as to his profit objective in entering a transaction is relevant, but we place greater emphasis on objective facts demonstrating a realistic potential for profit. Cherin v. Commissioner, 89 T.C. 986, 992 (1987). In James v. Commissioner, 87 T.C. 905, 918 (1986), affd. 899 F.2d 905 (10th Cir. 1990), *629 we outlined the applicable principles: A transaction is without its intended effect for Federal income tax purposes if (1) it is a sham, being a mere paper chase or is otherwise fictitious ( Falsetti v. Commissioner, 85 T.C. 332 (1985)), or (2) the transaction is devoid of economic substance consonant with its intended tax effects ( Frank Lyon Co. v. United States, 435 U.S. 561, 573, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978); Knetsch v. United States, 364 U.S. 361, 366, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960)). The substance of the transaction, not its form, determines its tax consequences. The transaction must have economic substance which is "compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance -- features that have meaningless labels attached." Frank Lyon Co. v. United States, 435 U.S. at 583-584; Estate of Thomas v. Commissioner, 84 T.C. 412 (1985); Hilton v. Commissioner, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982).
Both the taxpayer's subjective business purpose and the transaction's *630 economic substance may be relevant to this inquiry. Collins v. Commissioner, 857 F.2d 1383 (9th Cir. 1988); see also Sochin v. Commissioner, 843 F.2d 351 (9th Cir. 1988). In 1982 and 1983, Petro West sold 10,000-ton blocks of mineral ore located on the so-called Cole claims in Kern and San Bernardino Counties, California. Under Plan One of the Petro West program, a purchaser acquired a 10,000-ton block of mineral ore, including an optional limited warranty, for $ 6,500. The purchaser also generally entered into a standard mining contract with Mindamar to perform the mine development, mining, and refining of the 10,000-ton block of mineral ore for $ 42,000, with $ 37,500 of this amount to be provided by a purported lender (Interocean). The plan featured an approximately four-to-one deduction for each block purchased based on the deduction of mining development costs ($ 42,000) purportedly incurred by the purchaser under the Mindamar mining contract. We conclude on this record that the transactions here involved are completely devoid of economic substance and must be ignored for Federal income tax purposes. At the outset, the bulk of the *631 purported development cost generated by the loan of $ 37,500 from Interocean was a circular money movement patently spurious in nature. Such effort to create the appearance of legitimate financing clearly impugns the validity of the transaction. In any event, petitioner concedes the portion of the development cost deduction based upon such purported loans. The record indicates that the Petro West claims did not contain the mineral values touted in the Petro West promotional materials. Petro West represented that, based upon a comprehensive geological and metallurgical study of the property conducted by Golden Giant, the Petro West property contained substantial yardage of alluvial material carrying mineral values exceeding $ 32 per cubic yard. The study (hereinafter the Purcell report) in question was done in 1979 by geologists Bruce G. Purcell and Daniel Rhoades. In January 1982, Mr. Purcell notified Douglas Norman, the promoter of the Petro West program, that the $ 32 per cubic yard figure was not supported by the Purcell report and wanted it retracted. Mr. Purcell, in a letter to the California City Chief of Police dated February 11, 1982, again repudiated the Petro West *632 representation of the mineral ore values, stating that the value of the area covered by his report was approximately $ 6 per cubic yard and not $ 32 per cubic yard. Respondent's expert witness, Dr. Carl F. Austin, also analyzed available assay data with respect to the value of the gravel on these claims, including the 1979 Purcell report and the materials contained in such report, and independently concluded that a believable value in gold for the property was close to $ 6 per cubic yard. Dr. Austin made a detailed examination of the geology and mineral deposits of the Petro West placer claims and concluded that there was no demonstrable ore body on the claims that would sustain any commercial scale activity. He also concluded that the mining plans offered to Petro West investors were impossible of accomplishment and that the proposed processing plant operations were not suitable for the materials and conditions present on the property. Respondent's second expert witness, Robert L. Hamilton, also examined the mining site and the proposed processing plant and concluded that the mining program envisioned by Petro West was not economically viable. He reviewed the available materials *633 and reports (the so-called Prommel report, the Purcell report, and the Kent report) pertinent to the property and was unable to find indications of commercially marketable quantities of gold on the property. He testified that the apparent lack of available water in the district for the type of processing plant proposed by Mindamar posed a serious problem to the economic feasibility of the mining operation. His inspection of the Petro West claims where the blocks of mineral ore were located showed that bedrock was exposed at a shallow depth, suggesting that there was insufficient gravel available on those blocks to satisfy the proposed mining of 10,000 tons of mineral ore supposedly contained in each block. His analysis of the geological configuration of the Petro West claims indicated to him that many of the blocks in one segment of the plotted area showed similar shortcomings. Mr. Hamilton observed the plant site and estimated that less than 10,000 tons of mineral ore were ever actually mined and processed. Although petitioner suggests that a heap leaching treatment of the ore would produce higher yields of gold, Mr. Hamilton testified that the high percentage of fine material *634 present on the Petro West mine site would make that method ineffective for what was essentially a placer gold mine operation. The expert witness found no support for the assertion in the Petro West brochures that the average mineral value on the Petro West placer claims was $ 32 per cubic yard. We agree generally with respondent's expert witnesses. The testimony of petitioner's witnesses with respect to the evaluation of the claims here involved is unpersuasive. George R. Kent, petitioner's expert witness, has worked over the years primarily as a hard rock geologist. Prior to 1981, he had not worked closely with desert placer mines. In 1981, he was retained by Mindamar Energy Resources, Ltd., through Ross Dion, to inspect the placer deposits on the Cole leases. Mr. Purcell made available to Mr. Kent the pertinent materials and reports with respect to these leases. Mr. Kent conducted extremely limited tests of the mineral ore on the property. He took only three 150-pound ore samples from the Cole claims and, through tests, detected the presence of gold and scheelite. Mr. Kent did not regard the samples as meaningful. He prepared a report in September 1981, on the status *635 and economic potential of the Cole leases. He did not prepare an analysis of the cost of mining the gravel from the Cole lease site. Nor did he see the Canadian plant which was purportedly to be transported to the site of the Cole leases to engage in production of the mineral ore. He recommended an exploration/production phase as a means of adequately testing the property. We find Mr. Kent's conclusions of limited value. Petitioner's expert witness, Kenneth J. Masero, has a background in chemical engineering and geology. His testimony with respect to the geological and mining attributes of the property was extremely general and conjectural in nature. In any event, the record shows that in 1979, Mr. Masero had been retained by Purcell, Rhoades & Associates to do a preliminary examination and sampling on the Cole leases. Mr. Masero took 12 samples from various locations in the course of his sampling. He concluded that the average value of his samples (including gold and tungsten) was approximately $ 6 per cubic yard. In a letter dated October 24, 1983, to the Department of Corporations of California, Mr. Masero indicated that he had examined the Petro West brochure "Your Investment *636 in California Gold" and concluded that the values per cubic yard shown in the brochure misrepresented the results of his 1979 analytical studies of the ore on the Cole lease. In his letter to the Department of Corporations, Mr. Masero disclaimed any responsibility for the misuse by Petro West of his 1979 studies. We find nothing in the testimony of Mr. Masero to support even remotely the average mineral ore values used by Petro West in its promotional materials. Nor do we consider the testimony of petitioner's expert witness, Neal Immega, particularly helpful. His background did not extend to the areas of mine evaluation, mining methodology, or the evaluation of placer gravels. The record shows that he examined the mine site and the pilot plant and made some general observations as to the efficiency of the mining plant facilities that he observed. He testified that, in his opinion, additional mineral recovery processes should be explored. In short, the general tenor of his testimony provides little probative support for the values attributed by Petro West to the mining property involved. Nor does his testimony provide any persuasive evidence with respect to the economic viability *637 of the Petro West project. The Petro West claims are generally known as desert placer, or fanglomerates. A fanglomerate is a unique type of alluvium found in desert areas. Mineral deposits in such area are chaotic and erratic along both horizontal and vertical planes, making it difficult to extrapolate any test results from one area to another. Since the Purcell report concerned only the southernmost portion of the Petro West claims, its use as a basis for valuing the remaining Petro West claims was highly questionable. The evidence indicates that it would be extremely unfeasible to develop and mine discrete blocks of mineral ore on a block by block basis. Problems of access to individual blocks would be formidable. It would be virtually impossible to develop and mine discrete investor blocks without commingling gravel of one block with other blocks. Moreover, the established geological configurations of the random and highly unpredictable mineral deposits in this area suggests the unrealistic nature of developing and mining an individual block of ore separate and apart from the entire tract. In view of the erratic and highly unpredictable nature of mineral deposits in desert *638 placer claims, the existence of minerals and the mining experience of third parties in adjacent areas provide no useful information with respect to the commercial viability of any mining activity contemplated on the Petro West claims. We have also considered petitioner's arguments that the Petro West program contemplated selective mining of enriched striations within each block and that the intent of the Petro West program was to sell investors developed or beneficiated ore rather than a stated tonnage of mineral ore contained in a designated block of ore in order to attain the values touted in the promotional material. We deem such arguments meritless. The expert testimony clearly establishes the sheer impracticability of mining only the enriched segments within blocks. Moreover, the record demonstrates to our satisfaction that this area, given its geological make-up, would conceivably be mined commercially only in swaths, rather than in discrete blocks. Moreover, petitioner's arguments completely ignore the explicit terms of the sales of blocks of ore to investors. The relevant documents explicitly and unambiguously provide for the purchase of a specific 10,000-ton block of *639 mineral ore which purportedly contained certain minerals in commercially marketable quantities. In fact, under the program, an investor was given the option to mine his own block of ore if he so chose. The relevant documents also expressly provide that the developing, mining, and refining services would be performed by the mining company with respect to that particular 10,000-ton block of mineral ore purchased by the investor. Petitioner's contentions, which are based in a patent mischaracterization of the Petro West program, must be rejected. A further indication of the bogus nature of the entire Petro West operation is revealed by the mode of operations pursued by the entities involved. The purported mining and ore processing operation was conducted by Mindamar in an apparently makeshift plant which was in constant disrepair and wholly inadequate for commercial operation. Plans to bring a plant from Canada to the mining site never materialized. There are indications in the record that the whole purpose of operating a plant at all was to serve as a demonstration to investors on their visits to the site. Both Petro West and Mindamar hired key employees who obviously lacked *640 essential qualifications and expertise. A key employee of Mindamar testified that he ultimately concluded that Mindamar was not a bona fide operation. There is no persuasive evidence in the record to establish that Mindamar ever mined any identifiable investor blocks of mineral ore. Only two investors ever obtained any gold which purportedly came from their purchased blocks of ore. However, the record does not show where the mineral originated. Petro West did not file a Federal income tax return for 1983. In 1984 the entity forfeited its right to do business in California. Mindamar failed to file Federal income tax returns for 1982 and 1983. In September 1982, its corporate charter was revoked by the State of Nevada. In the fall of 1983, the Kern County District Attorney's office was conducting an inquiry in the activities of, inter alia, Petro West and Mindamar. In November 1983, the business premises of Petro West and Mindamar were searched pursuant to a judicially authorized search warrant and certain documents and materials were removed. In November 1983, Douglas Norman, Robert Salmon, Petro West, and Mindamar, among others, were indicted on numerous felony counts, *641 including grand theft. In November 1985, the Kern County District Attorney's office filed an information charging Douglas Norman, Robert Salmon, Petro West, Mindamar, and one Philip Smith with a variety of felony counts in connection with the activities of Petro West and Mindamar. In March 1988, Douglas Norman and Robert Salmon pled nolo contendere to two misdemeanor counts, and the remaining counts were dismissed. The Kern County District Attorney's office also brought a civil complaint against, inter alia, Douglas Norman and Robert Salmon, and obtained a summary judgment in December 1985, from the Superior Court of the State of California (Kern County) ordering Douglas Norman and Robert Salmon, inter alia, to make full restitution to all Petro West investors. In short, the record as a whole amply demonstrates the spurious nature of the Petro West-Mindamar gold mining operation. We conclude that the transaction involving the acquisition and mining of blocks of mineral ore by petitioner in 1982 and 1983 under the Petro West gold mining program were entered into by petitioner solely for tax benefits and were completely lacking in any discernible economic substance. In short, the *642 transactions were a sham. Consequently, the transactions must be disregarded for tax purposes. We therefore hold that petitioner is not entitled to deductions in any amount with respect to his participation in the Petro West program under the provisions of section 616 or any other provision of the Code. In view of our holding disallowing the purported development expenses on the ground that the Petro West gold mining program was a sham without any economic substance, we do not reach respondent's additional arguments for sustaining the disallowance of such deductions. Section 6653(a) for the years 1979 and 1980 and 6653(a)(1) for years 1981, 1982, and 1983 impose an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) for the years 1981, 1982, and 1983 provides for an addition to tax in an amount equal to 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). *643 Petitioner has the burden of proof on this issue. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). During the years at issue, petitioner was employed as an electrical engineer. Prior to 1982, he had exhibited some general interest in gold mining. At some point he became a member of the American Institute of Mining Engineers. Petitioner learned about the Petro West program from one Vello Kulbin, a Petro West salesman. In the fall of 1982, petitioner accompanies Vello Kulbin, who had extolled the Petro West program in newsletters, to the Petro West Mining property. He also made subsequent visits to the site where he saw some signs of mining operations. Petitioner had no significant background in the technical aspects of a mining operation. Even though the Petro West promotional materials emphasized the inherently risky nature of mining activities generally, petitioner made no serious effort to consult an independent geologist or mining engineer prior to his acquisition of the mineral ore blocks from Petro West in 1982 and 1983. Although the record shows that the legal title to the Petro West claims was shrouded in a morass of conflicting claims, petitioner *644 made no effort whatever to investigate Petro West's purported title to the ore blocks or his own rights to the ore blocks which he first acquired on December 30, 1982. He made no effort to record his certificate of ownership he received from Petro West designating the specific mineral ore blocks he acquired. In some instances, petitioner selected a particular block of mineral ore from Petro West maps. He chose to rely essentially on the tailored material in the Petro West offering materials. He chose to accept without question the bona fides of the financing made available for the bulk of the purported development costs. We do not regard the inquiries by petitioner's public accountant from Mr. Kulbin, the Petro West salesman, from the attorney who prepared the tax opinion in the Petro West literature, and some general inquiries to Internal Revenue Service employees as the equivalent of a diligent independent investigation into the program's merits. We note that petitioner filed his 1983 income tax return claiming development cost deductions from the Petro West transaction even after he had been informed by the District Attorney's office of Kern County that a civil lawsuit had *645 been filed in the Kern County Superior Court against Petro West, Douglas Norman, Robert Salmon, Mindamar, and others alleging misrepresentations to investors as to the potential for tax benefits and the true value of the gold in the mineral ore. Petitioner was also advised before the end of 1983 of the Grand Jury indictment against each of the above defendants including some 25 separate felony counts. We believe that the record as a whole clearly establishes negligence on the part of petitioner so as to warrant the additions to tax under section 6653(a), 6653(a)(1) and 6653(a)(2) as applicable. Respondent is sustained on this issue. Section 6621(c) provides for an increased interest rate with respect to any "substantial underpayment" (greater than $ 1,000) in any taxable year "attributable to one or more tax motivated transactions." The increased interest rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to the enactment of the statute. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). The term "tax motivated transaction" *646 includes any "sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v). The statutory language includes transactions, such as the Petro West gold mining program, which are fictitious in nature, i.e., sham, and without economic substance. Cherin v. Commissioner, 89 T.C. 986, 1000-1001 (1987); Patin v. Commissioner, 88 T.C. 1086, 1129 (1987), affd. sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Consequently, with respect to the underpayments here invoked attributable to the disallowed deductions incurred in connection with the Petro West transactions, the increased rate of interest applies. Sec. 6621(c)(1). With respect to returns filed after December 31, 1982, section 6661(a) imposes an addition to tax equal to 25 percent of any underpayment attributable to a substantial understatement of income tax. Pallottini v. Commissioner, 90 T.C. 498 (1988). *647 A substantial understatement is one that exceeds the greater of either 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1). If a taxpayer has substantial authority for the tax treatment of an item on his return, the understatement is reduced by the amount attributable to such items. Sec. 6661(b)(2)(B)(i). Furthermore, if a taxpayer adequately discloses on his return the relevant facts pertaining to any tax item, the amount of understatement is reduced by the amount of such item. Sec. 6661(b)(2)(B)(ii). However, if the tax item is attributable to a tax shelter, the amount of the understatement may only be reduced where there is substantial authority for the taxpayer's position and in addition the taxpayer reasonably believed his treatment of the item was more likely than not the proper tax treatment. Sec. 6661(b)(2)(C)(i). For the reasons discussed above, we have found that the Petro West gold mine program was a sham without any economic substance. Claims based upon unreal or sham transactions are not recognizable for tax purposes. Knetsch v. United States, 364 U.S. 361, 369, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960); Horn v. Commissioner, 90 T.C. 908, 943 (1988). *648 In view of the substantial tax benefits promised to investors in the Petro West program, which was a self-proclaimed tax shelter, and the complete absence of any economic feasibility in the proposed mining activities, we find that the principal purpose of the program here at issue was tax avoidance. Sec. 6661(b)(2)(C)(ii). Moreover, petitioner has not presented substantial authority for his position or that he reasonably believed the claimed tax treatment was "more likely than not" the proper treatment. Sec. 6661(b)(2)(C)(i). It is clear from the record that petitioner did not make the kind of independent or factual analysis of the Petro West program which would enable him to formulate any reasonable belief one way or another as to whether the tax treatment given to the claimed deduction was more likely than not the proper tax treatment. In all, the general approach of petitioner, a well-educated and knowledgeable individual, to the economic aspects of his investments in the Petro West program, as contrasted to the tax benefits involved, appears to be one of studied indifference. See Ferrell v. Commissioner, 90 T.C. 1154, 1205-1206 (1988). We hold that *649 the additions to tax under section 6661 are applicable with respect to petitioner in the taxable years involved. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
*. 50 percent of the interest due on the underpayment of $ 3,550 due to negligence. ** 50 percent of the interest due on the underpayment of $ 7,839 due to negligence. *** 50 percent of the interest due on the underpayment of $ 6,903 due to negligence.↩