THOMAS M. SIVIC AND ADRIANA J. SIVIC, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sivic v. Commissioner
Docket No. 18197-90
United States Tax Court
T.C. Memo 1993-54; 1993 Tax Ct. Memo LEXIS 58; 65 T.C.M. (CCH) 1906; February 18, 1993, Filed *58 Decision will be entered for respondent. For petitioners: Angelo F. Lonardo and Leonard W. Yelsky. For respondent: Mario J. Fazio. BEGHE
BEGHE
MEMORANDUM OPINION BEGHE, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Year
Deficiency
1981
$ 15,890.72
1982
237.00
Respondent also determined that petitioners are liable for increased interest under section 6621(c) (formerly sec. 6621(d)) for the taxable year 1981. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure. All references to "petitioner" are to Thomas M. Sivic. The issues for decision are: (1) Whether petitioner is entitled to a $ 34,155 deduction for his distributive share of a partnership loss for 1981; (2) whether petitioner is entitled to the full $ 700 investment tax credit claimed on his 1982 income tax return, or only the $ 463 allowed by respondent; and (3) whether petitioner is liable for 1981 for additional interest under section 6621(c) for a substantial underpayment attributable to a tax motivated transaction. *59 We hold for respondent on all three issues because petitioner has failed in each instance to carry his burden of proof. Petitioners were residents of Chardon, Ohio, when they filed their petition. Background
A. The Structure of the Partnerships
1. Devonian Shale Technology Associates
On December 28, 1981, Peter Lance Segall, as general partner of Devonian Shale Technology Associates (Devonian), filed a limited partnership agreement and an amended limited partnership agreement for Devonian with the West Virginia secretary of state. Devonian's principal place of business, as specified in the agreements, was New York City. Under the terms of the amended agreement, limited partners were to contribute $ 18,000 for each unit of limited partnership interest by making a $ 9,000 cash contribution and a note for the $ 9,000 balance payable February 15, 1982, with interest at 9 percent per year. Devonian elected the calendar year as its taxable year and elected to use the accrual method of accounting. Devonian's promoters included the following: (1) Dr. Lowell Zane Shuck, president of Devgo Technologies, Inc., (Devgo) who was statutory agent for Devonian; (2) William *60 Kerschbaumer, president of Harper Operations Corp. and Petroleum Resources, Inc.; (3) Dr. Melvin Ehrlich, president of Countsville Pipeline, Inc., and scientist for Devgo; (4) Joel Pensley, president of Roane Properties, Inc.; (5) Leah McCann; and (6) D. Dean Rogers. 2. Sivic Investment Partnership
On December 31, 1981, 3 days after Devonian filed its amended limited partnership agreement listing Sivic Investment Partnership (SIP) as one of its limited partners, petitioner, then a resident of Cleveland, Ohio, and William Kerschbaumer, a resident of Pittsburgh, Pennsylvania, executed an agreement to form SIP (a general partnership) for the sole purpose of acquiring two limited partnership units in Devonian. SIP's stated principal place of business was Cleveland, Ohio. Under the terms of the partnership agreement petitioner was to make an $ 18,000 cash contribution to partnership capital and Kerschbaumer was to sign a note obligating himself to contribute $ 18,000 to partnership capital by February 15, 1982. On December 31, 1981, petitioner wrote a $ 9,000 personal check payable to the order of Devonian in partial fulfillment of his duty to contribute $ 18,000 to SIP. *61 Petitioner testified that SIP executed promissory notes for balances due Devonian for two units of limited partnership interest, and that originals of the notes in question and the assumption agreement were turned over to Devonian, but that SIP never retained any copies for its own records. There is no documentary evidence that bears on whether those notes were ever executed. There is also no documentary evidence that petitioner ever signed a note in favor of SIP or Devonian for the $ 9,000 balance due SIP and Devonian, or that he ever paid that balance or any interest thereon. Petitioner did not claim a deduction for interest paid to SIP or Devonian on his 1981 or 1982 Federal income tax returns. Under the terms of the SIP agreement, partnership income was to be allocated among the partners "according to the ratio of their respective aggregate cash contributions to Partnership capital." The agreement also provided for a special allocation of all of SIP's 1981 losses to petitioner and all of SIP's 1982 losses to Kerschbaumer, regardless of their cash contributions to partnership capital. Thereafter, all losses were to be allocated pro rata. On or about December 31, 1981, petitioner *62 also orally agreed to fragment his interest in SIP by assigning one-half his interest to Dave Antine and Donald Zinner. [1] Petitioner's understanding with Antine and Zinner was that he would hold a net effective interest in SIP of 25 percent, that Antine and Zinner would each hold a net effective interest of 12.5 percent, and that Kerschbaumer would continue to hold his 50-percent interest in SIP. There is no evidence that Antine and Zinner paid or tendered any consideration for these interests. It appears that after petitioner and Kerschbaumer executed the SIP agreement, petitioner wrote the word "agent" after his name at the top of the SIP agreement, but neither petitioner nor Kerschbaumer initialed this addition to indicate that it was part of the agreement. At trial petitioner explained that he acted as agent for Antine and Zinner when he executed the SIP agreement. Inasmuch as Antine's and Zinner's names do not appear anywhere in the SIP agreement, and neither of them signed that agreement, we conclude that Antine and Zinner were not partners in SIP and that the purported fragmentation agreement had no legal effect. *63 For the taxable year 1981, Devonian issued a Schedule K-1 to SIP reporting SIP's distributive share of Devonian's 1981 losses as a $ 68,310 ordinary loss. SIP did not file a partnership return of income (Form 1065) for 1981. [2] *64 In accordance with the SIP partnership agreement and the subsequent oral fragmentation agreement with Antine and Zinner, petitioner reported on Schedule E of his joint 1981 Federal income tax return a $ 34,155 partnership loss in connection with SIP. [3] In 1982, SIP's partners changed. On its 1982 partnership return of income, SIP attached Schedules K-1 for three sets of partners: (1) petitioner, (2) Louis and Helen Silverstein, and (3) Devgo Technologies, Inc. [4] It appears that both the Silversteins and Devgo either contributed $ 9,000 or signed notes obligating themselves to contribute $ 9,000 to become partners in SIP and that both of them had a 25-percent interest. Apparently, these additional partners were brought in to replace Kerschbaumer. B. Devonian's Activities
*65 Sometime in 1981, Devonian circulated a 153-page confidential private placement memorandum and a 9-page synopsis [5] to potential investors that offered for sale units of limited partnership interests in Devonian. The offer was to terminate on November 30, 1981, but was subject to extension by the general partner until December 31, 1981. According to the memorandum and synopsis, Devonian was formed for the purpose of researching, developing, and applying advanced gas well fracing [6] technologies to an oil and gas lease on property optioned by Devonian in Roane County, West Virginia. The stated business objective was to maximize the production of gas from developmental wells drilled to the Devonian shale stratum. *66 Devonian's private placement memorandum reported that "Enormous (200 to 900 trillion cubic feet of gas resources) [sic] have been identified during the past five years in Devonian Shales within the Appalachian basin. Development of the technology for stimulation of the shales has just begun and is still in its infancy." According to the memorandum, traditional techniques for stimulating gas wells would not work well in Devonian shale because their application would damage the well bore and cause cleanup problems. However, according to the memorandum, fracing technologies for stimulating wells work best in shales because they create the most effective paths for oil and gas to flow into the well bore and minimize clean-up problems. Devonian therefore proposed to engage Devgo to develop the fracing technology. Devonian would then exploit that technology by drilling gas wells in West Virginia to the Devonian shale stratum, extracting the gas, and sharing the profits from the sale of natural gas among its partners. Attached as an exhibit to the private placement memorandum was an unexecuted research and development agreement. That agreement provided that Devonian was to pay Devgo *67 a fee as follows: (a) from the proceeds of the offering invested by Limited Partners of the Partnership pursuant to the PPM [(private placement memorandum)], an amount equal to all of the proceeds so received less all sales commissions, General Partner's fees, the turnkey cost of the wells on the Partnership's leased property, legal, accounting and printing fees, and a working capital reserve of at least $ 5,000 (all as particularly described in the PPM) and (b) $ 32,000 per Unit sold for R&D Program-I and, in the event the Partnership funds R&D Program-II, $ 22,500 per Unit sold or R&D Program-II by delivery of two full recourse promissory notes to Devgo. * * *
The agreement also provided that Devgo would "maintain and keep books and records" at its West Virginia offices. Petitioner has not produced any documentary evidence that Devonian ever paid any of these amounts. At some point, "early on in the development" of Devonian, there was a dispute between Segall and the other members of the partnership. Segall apparently stole some of Devonian's funds and left New York with the partnership's records. Devonian sued Segall in the New York Supreme Court for Nassau County *68 and obtained a judgment against him, but never recovered the records. However, Devonian's successor general partner, Dr. Strongin, was able to carry on its affairs by using copies of the stolen records. According to the statutory notice of deficiency, Devonian claimed $ 1,012,000 in deductions for research and development on its 1981 partnership return of income. Petitioner claims that Devonian was entitled to deduct that entire amount. However, petitioner has not produced any substantiating documentary proof of Devonian's 1981 research and development expenses. Although petitioner claims that no such records are available because all of Devonian's records were stolen by Segall, petitioner has not offered any of Devgo's records as proof of these expenditures. Dr. Melvin Ehrlich testified on behalf of petitioner that Devonian incurred $ 1,012,000 in R & D expenses in 1981 and that Devonian signed a note obligating itself to pay Devgo for the research and development. [7] Dr. Ehrlich simply read that figure from an IRS form listing respondent's adjustments to Devonian's 1981 information return and did not represent his recollection of what Devonian actually paid or was obligated *69 to pay Devgo. Moreover, Dr. Ehrlich testified that the research for which Devonian was purportedly obligated to pay Devgo was actually conducted before Devonian was formed as a limited partnership. He said the R & D was conducted between some period beginning in "the early part of 1981" and the time Devonian began marketing the limited partnership later in 1981. According to Devonian's private placement memorandum, *70 Devonian had acquired an option from Roane Properties, Inc., of West Virginia (Roane), to lease a maximum of 135 acres located in Roane County, West Virginia, known as the S.R. Fields. [8] There were maps of the area attached to the memorandum and synopsis. The memorandum states that "The Rome Trough, a significant fracture zone, runs through the property." The property was to be divided into four sections. For each section a gas well drilling permit was said to have been obtained, presumably from the State of West Virginia. The lease purportedly permitted Devonian to drill one gas well on each section from 2,000 to 6,000 feet in depth. Devonian was to acquire a 75-percent working interest in the gas recovered until payout of $ 1 million per well and 60 percent thereafter. Roane was to be paid an owner's royalty. Devonian purportedly obtained an engineer's report from Technology Development, Inc., [9] *72 that estimated the natural gas reserves in the *71 S.R. Fields to exceed 1 billion cubic feet per well. The gas to be recovered from these reserves was said to be "unregulated". The memorandum also stated that Roaring Fork Gas Co. of Charleston, West Virginia, a subsidiary of Cabot Corp., had expressed an interest in purchasing the gas from Devonian at "the NGPA tight sands price which presently is $ 5.60/mcf." [10] Devonian projected that if the gas was sold at this price, each unit of Devonian partnership interest would earn $ 350,000 over a 20-year period. However, Dr. Ehrlich testified that the price of natural gas rose to about $ 7.18 per mcf around 1981 and 1982. Dr. Ehrlich also stated that in 1983 and 1984 the price of natural gas dropped as a result of deregulation and shifts in energy requirements. According to Dr. Ehrlich, Cabot reneged on the contract with Devonian to purchase its natural gas because of these price changes and, as a result, Devonian ultimately proved to be a total loss. According to Devonian's private placement memorandum, the gas wells were to be drilled by Harper Operations Corp. (Harper), of which William Kerschbaumer, petitioner's partner in SIP for 1981, was president. According to the private placement memorandum, the turnkey drilling contract [11] between Devonian and Harper provided that Harper would drill four gas wells to the Devonian shale stratum within 1 year from the effective date of the operating agreement. According to the private placement memorandum the drilling cost would be as follows: The *73 turnkey drilling cost is $ 300,000. In the event the minimum of 20 Units of Limited Partnership Interests are sold, Harper will advance to the Partnership $ 100,000 of the turnkey price of one well. If 40 Units are sold, Harper will advance $ 50,000 per well for two wells to be drilled; if 60 Units are sold, Harper will advance $ 50,000 per well for three wells to be drilled; and if 80 Units are sold, Harper will advance $ 50,000 per well for four wells to be drilled. The advances will be evidenced by a promissory note bearing simple interest of 9% per annum ("the turnkey drilling note"). The turnkey drilling note will be payable from 25% of the Partnership's net cash flow from operations. It will be recourse to the Partnership. However, Limited Partners will not be liable for its repayment. After the wells are drilled, Harper will charge a monthly operations fee of $ 300 per well. Countsville Pipeline, Inc., Spencer, West Virginia, ("Countsville") will build a gas pipeline between the Partnership's property and a collection system maintained by Roaring Fork Gas Corporation. Countsville will charge the Partnership $ .25/mcf for use of the pipeline.
*74 There is no documentary evidence, other than the recitals in the private placement memorandum and the positions taken on Devonian's 1981 return of income (as evidenced by the notice of deficiency), that Devonian ever paid Harper or anyone else any amounts in connection with the drilling or operation of oil or gas wells. Dr. Ehrlich testified that Harper actually drilled two of the four wells sometime late in 1981 at a cost of $ 300,000 per well. Devonian deducted $ 500,000 on its 1981 partnership income tax return for intangible drilling costs. There is no other evidence concerning Devonian's actual gas well drilling activities in 1981. According to the private placement memorandum, Devonian was to pay its general partner a basic fee of $ 6,000 in 1981 and $ 750 per month for managing the partnership. There is no documentary evidence that Devonian ever paid its general partner a fee. C. The 1982 Investment Tax Credit
For the taxable year 1982, SIP filed a Form 1065 claiming a $ 64,201 net operating loss. No part of this loss was allocated to petitioner. SIP did not claim that its partners were entitled to any tax credits as a result of its activities in 1982. Petitioner's *75 Schedule K-1 does not show that he was entitled to any investment tax credit on account of his interest in SIP. Nevertheless, petitioner claimed a $ 700 investment tax credit on his 1982 joint income tax return. Respondent determined that petitioner was not entitled to $ 237 of this amount. Discussion
A. 1981 Losses and 1982 Investment Tax Credit
On brief, respondent states that "The deduction in issue is the petitioner's distributive share of loss in 1981 attributable to deductions claimed by Devonian for research and development, intangible drilling costs and guaranteed payments." [12] Respondent determined that petitioner is not entitled to any part of the $ 34,155 share of Devonian's 1981 loss claimed on his 1981 return because the transactions in question were factual shams "inspired and designed" for the sole purpose of creating tax losses and were not activities engaged in for profit. Respondent also disallowed the deduction for research and development expenses on the ground that neither Devonian nor any person acting on behalf of Devonian conducted any qualifying research and development. Respondent disallowed the deduction for intangible drilling costs on *76 the ground that Devonian neither operated nor drilled any oil or gas well in 1981. Respondent also disallowed the deduction for SIP's share of Devonian's guaranteed payments to Segall, Devonian's general partner, on the ground that the payments were unsubstantiated. As further support, respondent states that petitioner is not entitled to the full amount of the claimed SIP losses because the losses exceeded his basis in SIP and petitioner's investment was not at risk. Respondent also determined that petitioner is not entitled to $ 237 of the $ 700 that petitioner claimed as an investment tax credit for the year 1982. Petitioner has the burden of proving that he was entitled to the deductions and credits claimed on his 1981 and 1982 joint income tax returns. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Respondent argues that petitioner is not entitled to any of the claimed 1981 partnership *77 loss on the ground that SIP and Devonian were sham transactions and that they were not activities engaged in for profit within the meaning of section 183. Alternatively, respondent argues that even if Devonian and SIP can pass the sham transaction test, petitioner has not proved that Devonian was entitled to deductions in 1981 for research and development, intangible drilling costs, and guaranteed payments. We agree with respondent. Petitioner has presented very little evidence to substantiate the deductions and credits claimed on his 1981 and 1982 joint Federal income tax returns that respondent disallowed. Although we have carefully considered the record before us, we cannot find enough evidence that proves that Devonian and SIP were engaged in any type of business activity, other than the solicitation of investors, much less a for-profit gas well drilling activity. In addition, petitioner has not adduced enough evidence for us to conclude that Devonian was entitled to claim deductions for any part of the $ 1,012,000 in research and development expenditures shown on its 1981 partnership return of income. It appears that much of the alleged research and development was conducted *78 independently by Dr. Ehrlich and Devgo without any contract with Devonian, and that Devonian simply "purchased" the rights to the fruits of that research and development, as well as the corresponding section 174 deduction. Nor has petitioner persuaded us that Devonian was entitled to claim $ 500,000 in intangible drilling costs or $ 6,000 in guaranteed payments. Although much of what is written in the detailed and carefully prepared private placement memorandum seems to make sense as a business plan, there is very little evidence to show that any of Devonian's proposed activities, as described in that memorandum, were ever carried out. There are substantial gaps both in the documentary evidence and in the testimony of Dr. Ehrlich and petitioner that prevent us from concluding that it is more likely than not that Devonian was entitled to these various deductions. Petitioner also has failed to produce evidence in support of the investment tax credit claimed through SIP for 1982. There is no evidence in the record of any section 38 property that served as the basis for such credit. Secs. 38, 46, 48. Petitioner does not even say what the alleged section 38 property was supposed *79 to be. We therefore conclude that petitioner has failed to carry his burden of proof with respect to the 1981 partnership loss and the 1982 investment tax credit and accordingly hold for respondent. Rule 142(a). We understand that petitioner may well have encountered difficulties in obtaining the evidence he needed to prove his right to the full amounts claimed as losses and credits on his returns, inasmuch as he claims that Segall, Devonian's general partner, stole Devonian's records. However, we find it difficult to believe that, with the exception of the $ 9,000 check, petitioner did not maintain records of the transactions to which he, through SIP, was a party. For example, petitioner's and SIP's notes, subscription documents, and assumption agreements have not been offered as evidence. Petitioner, who was a C.P.A. during the years at issue, knew or should have known that he should have retained his own copies of these important documents. In addition, Dr. Ehrlich testified that Dr. Strongin, the successor general partner, was able to operate Devonian without the original documents stolen by Segall because he had copies of these documents. We do not know whether these *80 copies are identical to what petitioner has presented to us. However, it seems likely that Dr. Strongin had more to work with than what petitioner has offered us. It is also hard to believe that Dr. Ehrlich did not maintain Devgo's records, as required, with respect to the R & D conducted in 1981. There is no doubt that tax considerations played a major part in Devonian's plan to drill gas wells in West Virginia. The private placement memorandum and synopsis are replete with references to the income tax aspects of the transaction, and the memorandum included a 36-page tax opinion by a New York City law firm and Devonian's projected tax losses for 1981 and 1982. [13] The fact that the transactions in question were motivated, at least in part, by income tax considerations does not mean that they are shams. James v. Commissioner, 87 T.C. 905, 918 (1986), affd. 899 F.2d 905 (10th Cir. 1990). However, it is incredible that such tax-conscious investors did not maintain records to substantiate their tax losses. We do not accept petitioner's excuse that Segall stole all the relevant records. Nor do we accept petitioner's argument *81 that the evidence in the record proves his case because it is the "best evidence" of what happened. The best evidence rule is a rule of admissibility and does not determine the weight of the evidence to which the rule applies. Fed. R. Evid. 1002; Homeowners Group, Inc. v. Home Marketing Specialists, Inc., 931 F.2d 1100, 1109 (6th Cir. 1991). We might have applied the rule in Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), to allow petitioner some part of the claimed losses if he had supplied us with a reasonable evidentiary basis on which we could estimate Devonian's deductible expenses for 1981. However, because of the lack of evidence, and after *82 considering the legal arguments made by both parties, we do not allow petitioner any of the partnership loss he claimed for 1981. Vanicek v. Commissioner, 85 T.C. 731, 743 (1985); see also Visser v. Commissioner, T.C. Memo. 1993-13. B. Increased Interest
Respondent determined that petitioner is liable for the increased rate of interest provided in section 6621(c) (formerly section 6621(d)). That section provides for a rate of interest on substantial underpayments attributable to tax motivated transactions that is 120 percent of the underpayment rate provided in section 6601. Section 6621(c) applies to interest accrued after December 31, 1984. Patin v. Commissioner, 88 T.C. 1086, 1127 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). *83 Petitioner has the burden of proving that the increased rate of interest does not apply. Rule 142(a); Rybak v. Commissioner, 91 T.C. 524, 567 (1988). An underpayment is "substantial" if it exceeds $ 1,000. Sec. 6621(c)(2). The term "tax motivated transaction" is defined to include, inter alia, "any loss disallowed by reason of section 465(a)" and "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(ii), (v). Furthermore, deductions disallowed under section 183 relating to an activity not engaged in for profit are deemed to be "tax motivated". Patin v. Commissioner, supra at 1129; sec. 301.6621-2T, Q&A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984). Petitioner's underpayment in income tax for 1981 was substantial within the meaning of section 6621(c)(2). Inasmuch as we have held that petitioner has not proven that Devonian and SIP were not sham transactions or were activities engaged in for profit, we hold that petitioner is liable for the increased rate of interest under section 6621(c) on the entire underpayment for the taxable year 1981. Sec. 6621(c)(3)(A)(v). *84 To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. Petitioner, Antine, and Zinner were partners in the Ohio accounting firm of Harry Zinner & Co.↩
2. There is no evidence whether SIP filed a notice with respondent electing out of subch. K and the partnership filing requirements. Sec. 1.761-2, Income Tax Regs.↩ Inasmuch as SIP filed a Form 1065 for 1982, it appears that it did not so elect.
3. Inasmuch as 100 percent of SIP's 1981 loss was to be allocated to petitioner's share in SIP and petitioner purportedly had given up 50 percent of that share to Antine and Zinner, petitioner allocated to himself a 50-percent distributive share of SIP's 1981 loss (rather than 100 percent), and Antine and Zinner were each allocated 25 percent of the 1981 loss. However, because we have found that the oral fragmentation agreement had no legal effect, petitioner's distributive share of SIP's income and losses for 1981 should not have been reduced on account of the agreement with Antine and Zinner. In so finding, we do not express any opinion on whether the special allocation of loss between petitioner and Kerschbaumer had substantial economic effect within the meaning of sec. 704(b) and the regulations thereunder.↩
4. For 1982, each partner's percent share of SIP's capital and their percent share of profit and loss were as follows: ↩
Thomas M. Sivic
Silversteins
Devgo
Profit sharing
0%
50%
50%
Loss sharing
0%
50%
50%
Ownership of
capital
50%
25%
25%
5. The synopsis was compiled in March 1981.↩
6. As stated in the private placement memorandum, "fracing" (or "fracturing") is a procedure that uses water pressure to enhance the production of an oil or gas well. Under the Natural Gas Policy Act of 1978 (NGPA), Pub. L. 95-621, 92 Stat. 3350, (current version at 15 U.S.C. secs. 3301-3342 (1988)), gas produced from Devonian shale is considered to be "high-cost natural gas". 15 U.S.C. sec. 3317(c)(4) (1988). In the preamble to Regulations Covering High-Cost Natural Gas Produced from Tight Formations issued in 1980, the Federal Energy Regulatory Commission explained that: A "tight formation" [or "tight sand"] is a sedimentary layer of rock cemented together in a manner that greatly hinders the flow of any gas through the rock. Because such a formation is characterized by low permeability, wells drilled into gas-bearing formations of this kind usually produce at very low rates. To stimulate production from these formations, producers must use expensive enhanced recovery techniques. The technique usually applied to tight formations involves massive hydraulic fracturing, which creates a system of cracks permitting trapped gas to flow more easily into a wellbore. [45 Fed. Reg. 56034↩-56035 (Aug. 22, 1980); fn. ref. omitted.]
7. In 1981, Dr. Melvin Ehrlich was a professor of physics at the City University of New York. Dr. Ehrlich had also done "a good deal of work in geophysics." Dr. Ehrlich was a research scientist with and an officer of Devgo, a promoter of Devonian, and president and a director of Countsville Pipeline, Inc. Dr. Ehrlich testified that he personally performed the research and development work on behalf of Devonian. Dr. Ehrlich also signed SIP's 1982 partnership information return. He did this in his capacity as an officer (possibly vice president) of Devgo, which was a general partner of SIP in 1982.↩
8. There is no copy of the executed option or lease in the record.↩
9. The engineer's report was supposed to be attached as Exhibit H to the private placement memorandum, but it was not included. The report was allegedly available from Devonian's general partner upon request.↩
10. Quantities of natural gas are measured in cubic feet. An "mcf" is 1,000 cubic feet. The "tight sands" or "tight formations" price is set by the Federal Energy Regulatory Commission. See 18 C.F.R. sec. 271.701-271.703 (1992); supra note 6. For a brief history of the regulation and deregulation of natural gas, see Martin Exploration Management Co. v. FERC, 813 F.2d 1059 (10th Cir. 1987); see also Pierce, "Natural Gas Regulation, Deregulation, and Contracts", 68 Va. L. Rev. 63↩ (1982).
11. There is no copy of that contract in the record.↩
12. Devonian's 1981 partnership return of income (Form 1065) is not in evidence.↩
13. The second item discussed in Devonian's synopsis states that the projected tax loss per unit to 50-percent-tax-bracket investors for 1981 was $ 33,900 and for 1982, $ 36,237. An $ 18,000 investment for the years 1981 and 1982 would thus result in a net loss for tax purposes of $ 70,137 for the 2 years.↩